**MILON PLUAS LLP**
ANGEL D. PLUAS (SBN: 256478)
angel@milonpluasllp.com
JOSHUA MILON (SBN: 245287)
joshua@milonpluasllp.com
CHRISTOPHER J. DeCLUE (SBN: 282807)
chris@milonpluasllp.com
JOSE L. VALDEZ (SBN: 341234)
jose@milonpluasllp.com
20 North Raymond Ave., Suite 350
Pasadena, CA 91103
Tel.: (626) 229-0844
Fax: (626) 389-5451

**MANN ROGAL APC**
Matthew L. Mann (SBN: 276220)
mmann@mannrogal.com
Justin R. Rogal (SBN: 273352)
jrogal@mannrogal.com
16501 Ventura Boulevard, Suite 400
Encino, California 91436
Telephone: (310) 620-2314

Attorneys for Plaintiffs
GARY HERNANDEZ, RICARDO HERNANDEZ,
JUAN MANUEL CARRILLO, ET.AL.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT

**COMPLAINT FOR DAMAGES**

GARY HERNANDEZ, an individual, JUAN CARRILLO SR., an individual, FRANCISCO BAUTISTA, an individual, LUSIANO MORALES, an individual, RICKY HERNANDEZ, an individual, JOISE MENDEZ AVENDANO, an individual, ROMUALDO GUZMAN, an individual, JOSE LOPEZ GUZMAN, an individual, EFRAIN INDA VERDIN, an individual, POMILIO JACINTO ALTAMIRANO REYES, an individual, PEDRO REYES, an individual, JUAN PABLO CARILLO PADILLA, an individual, ELIAS HERNANDEZ, an individual, ARMANDO REYES, an individual, JUAN CARRILLO DE LA LUZ an individual,

Plaintiffs,

vs.

CLOVER FLAT LAND FILL INC., a California Corporation, UPPER VALLEY RECYCLING, INC., a California Corporation; UPPER VALLEY DISPOSAL SERVICE; a California Corporation; UPPER VALLEY DISPOSAL HOLDINGS, INC.; a Delaware Corporation; VISTA CORPORATION, a California Corporation; WHITEHALL CORPORATION, a California Corporation; WASTE CONNECTIONS US, INC., a Delaware Corporation; WASTE CONNECTIONS OF CALIFORNIA INC., a California Corporation; WASTE CONNECTIONS MANAGEMENT SERVICES, INC., a Delaware Corporation; PESTONI ENTERPRISES LLC, California Limited Liability Company; UVA VINEYARD MANAGEMENT LLC, a California Limited Liability Company; CHRISTINA PESTONI, an individual; and DOES 1 to 50, inclusive,

Case No.:

**COMPLAINT FOR DAMAGES:**

1. **VIOLATION OF THE CIVIL RIGHTS ACT OF 1866 & 42 U.S.C. 1983**
2. **DISCRIMINATION AND RETALIATION IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT 29 U.S.C. § 2615**
3. **VIOLATION OF LAB. CODE § 1102.5**
4. **VIOLATION OF LABOR CODE § 244 - IMMIGRATION RELATED THREATS**
5. **RETALIATION FOR REPORTING EMERGENCY CONDITION IN VIOLATION OF CAL. LABOR CODE § 1139**
6. **DENIAL OF AND DISCRIMINATION BASED UPON THE USE OF SICK LEAVE**
7. **RACE AND NATIONAL ORIGIN DISCRIMINATION**
8. **HARASSMENT**
9. **DISABILITY DISCRIMINATION**
10. **FAILURE TO ACCOMMODATE**
11. **FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS**
12. **CALIFORNIA FAMILY RIGHTS ACT RETALIATION**
13. **ASSOCIATIONAL DISCRIMINATION**
14. **FEHA RETALIATION**
15. **FAILURE TO PREVENT DISCRIMINATION, HARASSMENT, AND RETALIATION**
16. **VIOLATION OF LABOR CODE § 246.5**
17. **VIOLATION OF LAB. CODE § 6310**
18. **VIOLATION OF LAB. CODE § 6311**
19. **VIOLATION OF LAB. CODE § 6399.7**
20. **VIOLATION OF LABOR CODE § 232.5**
21. **VIOLATION OF LABOR CODE SECTION 98.6**
22. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
23. **FAILURE TO PAY MINIMUM OR**

2

**COMPLAINT FOR DAMAGES**

Defendants.

**CONTRACTUAL WAGES**
24. **FAILURE TO PAY OVERTIME WAGES**
25. **FAILURE TO PAY MEAL BREAKS**
26. **FAILURE TO PROVIDE ACCURATE WAGE STATEMENTS**
27. **FAILURE TO PAY WAGES UPON DISCHARGE**
28. **VIOLATION OF LABOR CODE § 1197.5 - UNEQUAL PAY BASED ON RACE**
29. **VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200 ET SEQ.**
30. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
31. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**DEMAND FOR JURY TRIAL**

Plaintiffs GARY HERNANDEZ, JUAN MANUEL CARRILLO SR., FRANCISCO BAUTISTA, LUSIANO MORALES, RICKY HERNANDEZ, JOISE MENDEZ AVENDANO, ROMUALDO GUZMAN, JUAN CARRILLO DE LA LUZ, JOSE LOPEZ GUZMAN, EFRAIN INDA VERDIN, JUAN PABLO CARILLO PADILLA, POMILIO JACINTO ALTAMIRANO REYES, PEDRO REYES, ARMANDO REYES, ELIAS HERNANDEZ (collectively "Plaintiffs") complain of Defendants CLOVER FLAT LAND FILL INC., UPPER VALLEY RECYCLING, INC., UPPER VALLEY DISPOSAL SERVICE, UPPER VALLEY DISPOSAL HOLDINGS, INC., VISTA CORPORATION, WHITEHALL CORPORATION, WASTE CONNECTIONS US, INC., WASTE CONNECTIONS OF CALIFORNIA INC., WASTE CONNECTIONS MANAGEMENT SERVICES, INC., PESTONI ENTERPRISES LLC, UVA VINEYARD MANAGEMENT LLC, CHRISTINA PESTONI, and DOES 1-50 (collectively "Defendants") as follows:

## INTRODUCTION

This lawsuit stems from years of abuse of the Defendants' nearly all-Latino workforce.

**COMPLAINT FOR DAMAGES**

## PARTIES

1. At all times mentioned herein, Plaintiff GARY HERNANDEZ is and was an individual over the age of 18 years old and a resident of California.

2. At all times mentioned herein, Plaintiff JOISE MENDEZ AVENDANO is and was an individual over the age of 18 years old and a resident of California.

3. At all times mentioned herein, Plaintiff JUAN MANUEL CARRILLO SR. is and was an individual over the age of 18 years old and a resident of California.

4. At all times mentioned herein, Plaintiff FRANCISCO BAUTISTA is and was an individual over the age of 18 years old and a resident of California.

5. At all times mentioned herein, Plaintiff LUSIANO MORALES is and was an individual over the age of 18 years old and a resident of California.

6. At all times mentioned herein, Plaintiff RICKY HERNANDEZ is and was an individual over the age of 18 years old and a resident of California.

7. At all times mentioned herein, Plaintiff POMILIO JACINTO ALTAMIRANO REYES is and was an individual over the age of 18 years old and a resident of California.

8. At all times mentioned herein, Plaintiff JOSE LOPEZ GUZMAN is and was an individual over the age of 18 years old and a resident of California.

9. At all times mentioned herein, Plaintiff PEDRO REYES is and was an individual over the age of 18 years old and a resident of California.

10. At all times mentioned herein, Plaintiff JUAN PABLO CARILLO PADILLA is and was an individual over the age of 18 years old and a resident of California.

11. At all times mentioned herein, Plaintiff EFRAIN INDA VERDIN is and was an individual over the age of 18 years old and a resident of California.

12. At all times mentioned herein, Plaintiff ELIAS HERNANDEZ is and was an individual over the age of 18 years old and a resident of California.

13. At all times mentioned herein, Plaintiff ARMANDO REYES is and was an individual over the age of 18 years old and a resident of California.

14. At all times mentioned herein, Plaintiff JUAN CARRILLO DE LA LUZ is and

**COMPLAINT FOR DAMAGES**

was an individual over the age of 18 years old and a resident of California.

15. At all times mentioned herein, Plaintiff ROMUALDO GUZMAN is and was an individual over the age of 18 years old and a resident of California.

16. Defendant CLOVER FLAT LAND FILL INC. is a California Corporation that conducts business at various locations, including but not limited to, the 1285 Whitehall Ln, Saint Helena, California 94574 location.

17. Defendant UPPER VALLEY RECYCLING, INC. is a California corporation company that conducts business at various locations, including but not limited to, the 1285 Whitehall Ln., Saint Helena, California 94574 location.

18. Defendant UPPER VALLEY DISPOSAL SERVICE is a California corporation that conducts business at various locations, including but not limited to, the 1285 Whitehall Ln., Saint Helena, California 94574 location.

19. Defendant UPPER VALLEY DISPOSAL HOLDINGS, INC. is a Delaware corporation that conducts business at various locations, including but not limited to, the 1285 Whitehall Ln., Saint Helena, California 94574 location.

20. Defendant VISTA CORPORATION is a California corporation that conducts business at various locations, including but not limited to, the store located at 1285 Whitehall Ln., Saint Helena, California 94574 location.

21. Defendant WHITEHALL CORPORATION is a California corporation that conducts business at various locations, including but not limited to, the 1285 Whitehall Ln, Saint Helena, California 94574 location.

22. Defendant WASTE CONNECTIONS US, INC. is a Delaware corporation that conducts business at various locations, including but not limited to, the 1285 Whitehall Ln, Saint Helena, California 94574 location.

23. Defendant WASTE CONNECTIONS OF CALIFORNIA, INC. is a California corporation that conducts business at various locations, including but not limited to, the 1285 Whitehall Ln., Saint Helena, California 94574 location.

24. Defendant WASTE CONNECTIONS MANAGEMENT SERVICES, INC. is a

COMPLAINT FOR DAMAGES

Delaware corporation that conducts business at various locations, including but not limited to, the 1285 Whitehall Ln., Saint Helena, California 94574 location.

25.     Defendant PESTONI ENTERPRISES LLC is a California limited liability company that conducts business at various locations, including but not limited to, the 1285 Whitehall Ln, Saint Helena, California 94574 location.

26.     Defendant UVA VINEYARD MANAGEMENT LLC is a California limited liability company that conducts business at various locations, including but not limited to, the winery at 1673 Saint Helena Highway S., Saint Helena, California 94574.

27.     Defendant CHRISTINA PESTONI ("CHRISTINA") is and was an individual over the age of 18 years old and a resident of the State of California and was always relevant hereto an employee of Defendants Clover Flat Land Fill Inc., Upper Valley Recycling, Inc., and Waste Connections, Inc.

28.     Plaintiffs are presently unaware of the true names and capacities, whether individual, associate, corporate, or otherwise of Defendants DOES 1 through 50, or any of them, and therefore sues such Defendants by such fictitious names. Plaintiffs will seek leave to amend this Complaint to show the true names and capacities of such fictitiously named Defendants when the same have been ascertained. Plaintiffs are informed and believe and thereon allege that each of the Defendants designated herein as a DOE is legally responsible in some manner for the acts, omissions, and events alleged herein, and have proximately caused damages and injury to Plaintiffs as herein alleged.

29.     The California Legislature has recently amended the California Labor Code adding section 558.1, which expressly defines "employer or other person acting on behalf of an employer" to include a "natural person who is an owner, director, officer, or managing agent of the employer." As result, an employee is allowed to bring wage and hour claims against the corporate owners, directors, officers, or managing agents (e.g., department supervisors, payroll managers, human resources managers, other employees with the authority to transact on behalf of the business) who violate or cause to be violated various wage and hour laws in the Labor Code and name them as individual Defendants in a lawsuit.

COMPLAINT FOR DAMAGES

30.     At all times herein, each Defendant was the employee, agent, and servant of each other Defendants and in doing the things herein alleged, was acting within the course and scope of their authority as such, and with consent of each other Defendant.

31.     Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is in breach of some contract or is tortiously or otherwise legally responsible in some manner for the occurrences alleged in this Complaint and for Plaintiffs' damages.

32.     Plaintiffs are informed and believe and thereon allege, that at all times relevant hereto, Defendants, and each of them, were the agents, employees, managing agents, supervisors, coconspirators, parent corporation, joint employers, alter ego, and/or joint ventures of the other Defendants, and each of them, and in doing the things alleged herein, were acting at least in part within the course and scope of said agency, employment, conspiracy, joint employer, alter ego status, and/or joint venture and with the permission and consent of each of the other Defendants.

33.     Plaintiffs are informed and believe, and thereon allege, that there exists, and at all times herein mentioned, there existed, a unity of interest and ownership between Defendants that any individuality and separateness between said entities, have ceased, and said entities, and each of them, are, and at all times herein mentioned were the alter ego of the other.

34.     Plaintiffs are informed and believe and thereon allege, that Defendants, and each of them, acted in concert with one another to commit the wrongful acts alleged herein, and aided, abetted, incited, compelled and/or coerced one another in the wrongful acts alleged herein, and/or attempted to do so. Plaintiffs are further informed and believes, and based thereupon alleges, that Defendants, and each of them, formed and executed a conspiracy or common plan that they would commit the unlawful acts alleged herein, with all such acts alleged herein done as part of and pursuant to said conspiracy, intended to cause and in fact caused Plaintiffs' harm.

35.     Plaintiffs are informed and believe and hereupon allege that at all relevant times Defendants and each of them, were Plaintiffs' employers under California law, and that Defendants each did acts consistent with the employer-employee relationship with Plaintiffs.

36.     Whenever and wherever reference is made in this Complaint to any act or failure

7

**COMPLAINT FOR DAMAGES**

to act by a Defendant or co-Defendant, such allegations and references shall also be deemed to mean the acts and/or failures to act by each Defendant acting individually, jointly, and severally.

**JURISDICTION**

37. This action is based on Plaintiffs' claims of employment discrimination, retaliation, and wage violations, against Defendants, which arise under the Civil Rights Act of 1866 (42 U.S.C. § 1981), the Family and Medical Leave Act of 1993 (29 U.S.C. § 2601 et seq.) (FMLA), the California Fair Employment and Housing Act (Cal. Govt. Code §§ 12900, et seq.)(FEHA), the California Family Rights Act (CFRA), and various California Labor Code violations. This court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and, 28 U.S.C. § 1343 (a)(4).

38. This court also has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367. Plaintiffs' state law claims arise from the same common nucleus of operative facts as the underlying federal claims. Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience, and fairness to all parties.

39. This action is filed in this judicial district because the Defendants conduct business in the County of Napa and the amount of damages sought are within the jurisdiction of this Court.

40. This Court has jurisdiction over Plaintiffs' claims for restitution of unpaid wages and other ill-gotten benefits arising from Defendants' unlawful and/or unfair business practices under Business & Professions Code section 17200, et seq.

41. Plaintiffs received their right-to-sue letters from the Department of Civil Rights within the time permitted by statute and have thus exhausted their administrative remedies. Attached as **Exhibit A** are true and correct copies of Plaintiffs' Right to Sue Letters. Therefore, Plaintiffs may proceed with this lawsuit.

**GENERAL ALLEGATIONS**

**BACKGROUND**

42. Defendant UPPER VALLEY DISPOSAL SERVICE ("UVDS") is a solid waste collection, recycling, and disposal company, that operates various facilities located within the

**COMPLAINT FOR DAMAGES**

County of Napa, California, as well as other locations. UVDS manages and operates the Upper Valley Recycling and Compost site located at 1285 Whitehall Lane, in the City of St. Helena, California ("Whitehall Lane Facility.")

43.     According to Defendant UVDS's website, UVDS was granted its first franchise agreement to dispose of garbage in the Whitehall Lane Facility in 1963. At the time, the Pestoni family, headed by family patriarch Bob Pestoni, father of individual Defendant CHRISTINA PESTONI, owned the Whitehall Lane Facility. The Pestoni family also owned the Pestoni Family Vineyards located next door to the Whitehall Lane Facility. In 1966, the Pestoni family company began to recycle winery waste materials and then processed the grape pomace for compost at their Whitehall Lane Facility, which it then sold to the public. Throughout the years since it opened, UVDS continued to provide garbage disposal and composting services until it sold its operations on or about late 2023 to Defendant WASTE CONNECTIONS, a company that operates approximately 100 domestic landfills.

44.     Defendant CLOVER FLAT LAND FILL INC. owns and operates Clover Flat Resource Recovery Park and Landfill located at 4380 Silverado Trail North, in the City of Calistoga, California ("Clover Flat Facility.") For decades, the Clover Flat Facility was and is permitted to operate as a non-hazardous waste disposal site. Like the Whitehall Lane Facility, the Clover Flat Facility was also owned and operated by the Pestoni family before being sold to Defendant Waste Connections, which now runs the landfill under its larger corporate umbrella.

45.     When owned by the Pestoni family, Clover Flat Facility and Vista Corporation were wholly owned subsidiaries of Whitehall Corporation. Vista Corporation owns and leases 180 acres to Clover Flat Facility, including the 78 acres of permitted landfill area. Vista Corporation also owns landfill equipment that converts the landfill gas into electricity, which is then delivered and sold to Pacific Gas & Electric.

46.     Whitehall Corporation also had two additional wholly owned subsidiaries, UVDS and Upper Valley Recycling, Inc. (which processes, sorts, and sells recyclable material and compost.) Additionally, Whitehall Corporation is affiliated with the following companies through common ownership: Pestoni Brothers, LLC; Pestoni Leasing, Inc.; Pestoni Ranch, LLC;

COMPLAINT FOR DAMAGES

Quackenbush Mountain Resource and Recovery Compost Facility, LLC; Pestoni Family Estate Winery (formerly Rutherford Grove Winery); South Lake Refuse and Recycling, LLC; Deerpond, Inc.; and Pestoni Enterprises LLC. The principal stockholders of Whitehall Corporation are Robert Pestoni, deceased, (90%) and Linda Pestoni-Sereni (10%.)

47.    Defendants' Clover Flat Facility generates up to $1.36 million in revenue annually, which excludes significant revenue from collecting and processing fire debris caused by wildfires near Napa County. Under a franchise agreement, the Clover Flat Facility receives and processes waste and recyclable products generated in the UVDS service area. The agreement restricts inbound disposal and recycling tonnage into the landfill at 600 tons per day (up to 30 tons per day may come from outside Napa County).

48.    Between 1987 and 2023, Defendants hired Plaintiffs as Drivers, Heavy Equipment Operators, Leads, General Laborers, and Sorters to generally assist in various aspects of the waste disposal process at their Whitehall Lane and Clover Flat facilities. The Drivers' duties included, but were not limited to, driving to commercial or private customer locations, picking up the trash at either commercial or private locations, and then driving it to the designated processing facility, usually Whitehall Lane or Clover Flat. The Heavy Equipment Operators' duties included, but were not limited to, operating bulldozers, excavators, front-end loaders, and other heavy machinery, as well as continuously monitoring the waste processing operations, amongst other work duties. The Laborer/Sorters' duties included, but were not limited to, controlling the traffic of waste collection vehicles for safety and waste disposal purposes; sorting the trash between regular trash, recyclables, green waste, and hazardous waste; and preparing the waste for recycling or for final disposal. The Leads duties included, but were not limited to, supervising the Drivers, Operators and Laborers that reported to them. At all times, Plaintiffs performed their jobs with diligence and professionalism.

**DEFENDANTS POLLUTE THE NAPA RIVER AND SURROUNDING WINE-PRODUCING AREAS WITH TOXIC LEACHATE CREATED BY ITS GARBAGE-PROCESSING OPERATIONS**

49.    Defendants' Clover Flat Facility is located adjacent to two tributaries of the Napa

River. Similarly, the Defendants' Whitehall Lane Facility is located near a tributary to the Napa River and near the Napa River itself. Because landfills and garbage processing facilities like Defendants' Clover Flat and Whitehall Lane Facilities are repositories for a heterogeneous mixture of liquid and solid waste from residential, industrial, and commercial sources, they produce landfill "leachate"—a liquid wastewater product inherent to waste processing that contains a diverse mixture of often extremely toxic chemicals when rain or other water filters through the waste buried in the landfill. Landfill leachate typically contains nitrates, and heavy metals such as chromium, arsenic, iron, zinc, among other very toxic contaminants. Landfill leachate also contains bacteria and various pathogenic microbes.

50.     At Defendants' Clover Flat Facility, this untreated leachate was a byproduct of its general garbage and waste processing operations in the landfill. At the Whitehall Lane Facility, the leachate was caused by toxic waste liquids from recycling and the grease and oils used during the maintenance of Defendants' fleet of garbage trucks they kept at the facility. Similarly, Defendants also created toxic wastewater through its practice of heavily dosing the waste pond located at their Whitehall Lane Facility with toxic chemicals to reduce noxious smells created by the facility's waste processing operations that neighbors and other community members had complained about for decades.

51.     Because of the toxic nature of landfill leachate, government regulations mandate that Defendants transport leachate to an offsite wastewater treatment facility to undergo extensive and costly treatment to detoxify the leachate before proper and safe disposal.

52.     As collectors and processors of garbage, Defendants were required to comply with applicable health, safety, and environmental laws and regulations regarding the safe and appropriate handling and disposal of landfill leachate and other wastewater. These regulations included, but were not limited to, those laws and regulations promulgated and enforced by the U.S. Environmental Protective Agency ("EPA"), the California Environmental Protection Agency ("CalEPA"), the Department of Resources Recycling and Recovery ("CalRecycle"), California Department of Toxic Substances Control ("DTSC"), the California Department of Fish and Wildlife, and other relevant government entities.

**COMPLAINT FOR DAMAGES**

53. Throughout Plaintiffs' employment with Defendants, Defendants engaged in an illegal pattern and practice of improperly and illegally disposing of untreated leachate and other toxic wastewater into the environment in violation of applicable health, safety, and environmental laws and regulations to cut costs and increase profits. Specifically, for decades Defendants illegally disposed of the toxic landfill leachate and wastewater by diverting it to the local waterways, including the Napa River and its tributaries to avoid the costs of properly trucking out the toxic leachate to designated facilities for treatment and safe disposal.

54. As result of their failure to appropriately dispose of the toxic leachate, Defendants engaged in an illegal pattern and practice of exposing Plaintiffs and other employees to unsafe working conditions rife with toxic chemicals, pollution, and poisons while failing to provide Plaintiffs with proper protective equipment to decrease the effects of the toxic exposure.

55. In response to Defendants' illicit and unsafe business practices, Plaintiffs repeatedly complained to Defendants' supervisors and managers about the unsafe work conditions and exposure to toxic chemicals without adequate protection. However, Defendants' managers and supervisors disregarded Plaintiffs' complaints and continued to engage in the same unsafe, illegal and toxic work environment and then engaged in a prolonged campaign of retaliatory acts towards the Plaintiffs (and others) for having complained about Defendants' unsafe and dangerous business practices.

56. Due to their failure to properly dispose of the toxic leachate and other wastewater produced by their Clover Flat and Whitehall Lane Facilities, Defendants violated numerous government environmental regulations in which their government-issued operating permits were conditioned, including but not limited to California's Public Resource Code sections 43020, 44104, etc. For example, stormwater discharges associated with industrial activity at the Clover Flat and Whitehall Lane Facilities are regulated pursuant to the National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001 [State Water Resources Control Board]; and the Water Quality Order No. 2014-57-DWQ ("Industrial Stormwater Permit") issued pursuant to Section 402 of the Federal Water Pollution Control Act, Title 33, section 1342 of the U.S. Code. The Clover Flat Facility falls within Standard Industrial Classification ("SIC") codes

**COMPLAINT FOR DAMAGES**

4953 (Refuse Systems), 5093 (Scrap and Waste Materials), and 2875 (Fertilizer, Mixing Only.)

57.     The government's Industrial Stormwater Permit includes the following requirements for all permittees, including Defendants' Clover Flat Facility: (1) develop and implement a stormwater pollution prevention plan ("SWPPP"); (2) control pollutant discharges using, as appropriate, best available technology economically achievable ("BAT") or best conventional pollutant control technology ("BCT") to prevent or reduce pollutants; (3) implement BAT and BCT through the development and application of Best Management Practices ("BMPs"), which must be included and updated in the SWPPP; and (4) when necessary, implement additional BMPs to prevent or reduce any pollutants that are causing or contributing to any exceedance of water quality standards.

58.     In addition to violating their operating permits by deliberately releasing untreated toxic leachate into the environment, Defendants' actions also violated a litany of environmental laws and regulations that individually and collectively prohibit the improper disposal of toxic substances, such as untreated "leachate," including but not limited to, California Code of Regulations, Title 27, sections 20790, 20820, 20615, 20700, etc.; California Code of Regulations, Title 14, sections 17704, 17709, 17636, 17637, 17867, etc.; as well as various provisions of the Water Code, the Waste Code, the Water Pollution Control Act, and the Health and Safety Code, among others.

59.     In addition to Defendants disregarding and ignoring their employees' and Plaintiffs' complaints of unsafe work conditions and illicit behavior, on or around January 2023 and on or around April 2024, the Napa County cities (e.g., Calistoga, St. Helena, Yountville) and County of Napa, which includes City Managers and Elected Officials, ignored the complaints of the workers, including Plaintiffs, about the White Hall Lane and Clover Flat facilities.

## DEFENDANTS POLLUTED THE NAPA RIVER AND SURROUNDING WINE-PRODUCING AREAS THROUGH USE OF "GHOST PIPING"

60.     Throughout Plaintiffs' employment, Defendants effectuated their illegal scheme of unlawfully dumping their toxic leachate into the environment in a variety of ways. For example, Defendants forced employees, including Plaintiffs, to build and operate an illegal

**COMPLAINT FOR DAMAGES**

network of unpermitted underground pipes that do not appear on any official blueprints or maps, so called "ghost piping," to covertly drain the toxic leachate and other contaminated wastewater or stormwater from Defendants' facilities and into the surrounding hills, streams, public waterways, and/or the Napa River itself. Defendants built, expanded, and surreptitiously used their hidden network of "ghost piping" over a period of decades to drain out their toxic leachate reserves to avoid overfilling them. Defendants engaged in this practice of illegally polluting the Napa River watershed without detection by government inspectors and/or private environmental watchdog groups so as not to pay for the proper treatment and safe disposal of the toxic leachate, as well as to not have to pay the construction costs of building additional reservoirs to safely store the toxic liquid.

61.     In fact, in late 2023, a group of officials from the San Francisco Bay Regional Water Quality Control Board visited Defendants' Clover Flat Facility to search for the "ghost piping," and in October 2023 reported that they had discovered a culvert intercepting the creek and running beneath the access road with and "unknown purpose" as well as a metal pipe in the creek that runs under the access road toward the facility's wastewater containment pond, and "many pipes" going between the facility's containment pond and a stormwater drain.

62.     Unsurprisingly, leachate from Defendants' Clover Flat Facility has been found to contain toxic per- and polyfluoroalkyl substances (PFAS, which are commonly referred to as "forever chemicals") which are manmade chemicals that do not break down in the environment and have been linked to cancers and a range of other illnesses and health hazards. In fact, in early 2023, the San Francisco Regional Water Quality Control Board sampled a creek downstream from the Clover Flat Facility that is a tributary to the Napa River for eight PFAS, identifying multiple PFAS compounds in each sample, of the same type "detected at the Clover Flat facility." Notably, the U.S. EPA has listed Clover Flat as one of thousands of sites around the country suspected of handling harmful PFAS chemicals.

63.     Defendants' deliberate pollution of the Napa River watershed with toxic wastewater is particularly disturbing because Napa Valley contains some of the most valuable agricultural land in the country, and water from the Napa River is used by local wineries to

**COMPLAINT FOR DAMAGES**

irrigate Napa's famous vineyards, and is a significant community water resource. Moreover, thousands of people use the Napa River recreationally, such as for swimming or kayaking. Therefore, as result of their deliberate refusal to comply with government environmental rules and regulations and improperly releasing toxic untreated leachate into the Napa River watershed and surrounding environment, Defendants deliberately exposed employees, including Plaintiffs, as well as the general public to highly toxic leachate and leachate residue on a daily basis.

## DEFENDANTS' LONG HISTORY OF POLLUTION-RELATED VIOLATIONS

64. While individual Defendant Christina Pestoni, who previously served as Chief Operating Officer for the Whitehall Lane and Clover Flat Facilities and is currently the Director of Government Affairs at Waste Connections, has publicly stated that the company's operations met "the highest environmental standards" and were in full legal and regulatory compliance, Defendants' long track record of known environmental abuses demonstrates their pattern and practice of deliberately polluting the environment and thus exposing the general public, as well as their employees, including Plaintiffs, to extremely toxic chemicals.

65. For example, on November 23, 2022, Defendants agreed to a civil penalty of $619,400 imposed by government officials after a joint investigation conducted by the Water Board, the Napa County District Attorney's Office, and the California Department of Fish and Wildlife found that Defendants had violated their operating permit by discharging approximately 40,000 gallons of "leachate-laden" stormwater into one of the streams that fed into the Napa River, among other environmental violations.

66. Similarly, in 2019 a California Department of Fish and Wildlife Officer report regarding Defendants' Clover Flat Facility found that the facility had "severely polluted" both streams that flow through the landfill property with "large amounts of earth waste spoils, *leachate*, litter, and sediment," and that, as result, there was "essentially no aquatic life present."

67. In 2019, a Regional Water Board inspection also found that Defendants' Clover Flat Facility was improperly discharging "acidic stormwater" into a stream adjacent to the landfill property, lowering the surface water pH in the adjacent streams to acidic levels "toxic to aquatic life." Further, in 2019, the Regional Water Board again observed that Defendants' Clover

**COMPLAINT FOR DAMAGES**

Flat Facility had failed to inspect its "outdoor equipment and systems to identify leaks" or failed "to implement spill and leak response procedures." Specifically, the Regional Water Board observed leaks from Defendants' leachate collection tanks located at the Extraction Well and Leachate Recovery area at their Clover Flat Facility. Moreover, California's Department of Fish and Wildlife staff also observed "rust and cracking outside the leachate storage tanks" in Defendants' facility suggesting long-term leachate leaking, lack of maintenance, and Defendants' evident long-standing awareness of the issue.

68.    Furthermore, in 2019, a Napa County Environmental Health inspection report regarding Defendants' Clover Flat Facility determined that the facility had failed to provide "effective stabilization" for finished slopes or other "erodible areas." As result of Defendants' lack of action, the Napa County Environmental officials also found that sediment and erosion from the facility to nearby streams could reduce the sunlight reaching aquatic life and provided additional "attachment places" for other toxic pollutants to accumulate (*e.g.*, heavy metals.)

69.    In 2016, the Napa County Planning, Building and Environmental Services Department also investigated Defendants and found that they were in violation of Napa County Code section 16.28.100 – "Reduction of pollutants in stormwater" and section 16.28.090 – "Acts potentially resulting in violation of Federal Clean Water Act and/or Porter Cologne."

70.    In 2021, Napa County inspected Defendants' Clover Flat Facility and reported that the facility released "putrid offensive" smells. The smell was strong enough to cause three complaints to the Napa County's Local Enforcement Agency ("LEA".) Upon further inspection, Napa County officials determined that the noxious smell was being caused by the pond of water located in Defendants' facility that was "saturated with *leachate* rich in organic material."

**DEFENDANTS USE TOXIC LEACHATE TO WATER THE VINES AT PESTONI VINEYARD THAT THEN SELLS WINE MADE FROM CONTAMINATED GRAPES**

71.    In addition to illegally dumping toxic untreated leachate into the Napa River and/or its tributaries, Defendants also improperly disposed of toxic leachate for decades by using to surreptitiously "water" the vines at the Pestoni Vineyard that they also owned and which was located next to their Whitehall Lane Facility.  Defendants used their network of "ghost piping"

16

COMPLAINT FOR DAMAGES

and specially designed valves to connect pipes from their waste-processing facility to the irrigation system they used to water the vines at Pestoni Vineyard. Through this illegal system, Defendants connected the storage tanks/containment ponds that held untreated toxic leachate and illegally disposed of it by piping the leachate to Pestoni Vineyard and using the toxic leachate to water the vines to avoid paying to properly dispose of the toxic leachate. On many occasions, Defendants attempted to hide that they were pumping untreated, toxic leachate into the Pestoni vineyard by turning on the sprinklers on rainy days to cover up the smell of the leachate. Moreover, given that the Napa River and/or its tributaries were located near the Whitehall Facility, Defendants were aware that excess runoff from the rain that then included the toxic leachate they sprayed on the vines eventually drained into the Napa River and polluted it.

72.    As result of Defendants' surreptitious use of the Pestoni Winery's irrigation system to covertly and illegally dispose of the Whitehall Lane Facility's toxic leachate, Defendants not only contaminated the Pestoni vineyards, but also the resulting wine made from the contaminated grapes that they then sold to the public for as much as $400 a bottle for rare bottlings and/or vintages. In addition, by deliberately contaminating the vineyards with toxic leachate, Defendants exposed employees, including Plaintiffs, to toxic chemicals.

73.    In response to Defendants' illegal disposal of toxic leachate water, Plaintiffs complained to Defendants' supervisors and managers about the unsafe work conditions caused by Defendants' illegal disposal of the toxic wastewater and the harm it was causing them and the environment. However, Defendants' managers and supervisors disregarded Plaintiffs' complaints and continued to illegally dispose of the toxic leachate into the environment.

74.    After Plaintiffs and other employees complained to Defendants' supervisors and managers about Defendants' unsafe, illegal, and unethical business practices, Plaintiffs relationship with Defendants became strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe and dangerous business practices. Defendants' retaliatory actions towards the Plaintiffs, included but were not limited to, undeserved discipline, write-ups and warnings, reduction in hours, reassignment to undesirable and substantially physically demanding jobs,

**COMPLAINT FOR DAMAGES**

refusal to promote them, termination, forcing Plaintiffs to drive vehicles with faulty brakes and bald tires, forcing Plaintiffs to drive vehicles without working defrosters or window wipers, forcing Plaintiffs to work putting out fires without training or safety training equipment, forcing Plaintiffs to work sorting hazardous and medical waste without the proper safety equipment, forcing Plaintiffs to work mandatory overtime, changing the garbage truck drivers routes to add additional stops or making it longer, denying Plaintiffs access to the restroom facilities, denying Plaintiffs access to drinkable water, and denying Plaintiffs cool-down breaks.

## DEFENDANTS SELL "ORGANIC" COMPOST IT DELIBERATELY CONTAMINATED WITH TOXIC LEACHATE TO THE PUBLIC

75.    Defendants also engaged in a pattern and practice of improperly disposing of their toxic landfill leachate and acidic stormwater by instructing its employees, including Plaintiffs, to use the polluted water to spray the compost that was being manufactured at their Whitehall Lane Facility from organic winery waste materials such as grape pomace. Excess heat is a common byproduct of the composting process created by normal chemical reactions that occur during the decomposition of organic plant materials. As result, Defendants' employees, including Plaintiffs, had to regularly moisten the large piles of compost to prevent the compost itself from catching fire, which it often did. However, instead of using water, Defendants ordered Plaintiffs to use toxic leachate to moisten the compost to prevent fires, and to use it to put out any resulting fires in order to avoid paying for the leachate's proper treatment and safe disposal.

76.    Defendants then sold the contaminated toxic compost to the general public falsely claiming that it was certified as "organic." While Defendants advertise on their website that their compost is certified and listed with the Organic Materials Research Institute ("OMRI"), which specifically requires that certifiers *avoid* contamination from pathogenic organisms and *heavy metals*, Defendants deliberately *contaminated* the compost with toxic leachate that contained heavy metals and then improperly sold it as "certified organic." In fact, Defendants' improper use of toxic landfill leachate and acidic stormwater to water the compost is not just a violation of OMRI Standards, but it is also a violation of government regulations and laws, including Title 7 of the Code of Federal Regulations section 205.203.

**COMPLAINT FOR DAMAGES**

77.     Defendants' practice of selling compost deliberately contaminated with toxic leachate is particularly egregious because Defendants were aware that when the general public, including local wineries, purchased the contaminated compost to use in their homes and vineyards, they would contaminate not only their homes and the vineyards from which they made wine, but would themselves (and their employees) become exposed to its toxic chemicals.

78.     Plaintiffs are informed, believe, and hereon allege that Defendants' practice of using toxic leachate to water the compost that Defendants then sold as "certified organic" continues to this day by allowing their contaminated water reservoirs to fill up with rain to overflow and then using the contaminated water it to moisten the compost. In fact, as recently as 2023, when Napa County officials inspected Defendants' facilities, they observed that there was "accumulation of either rainwater or leachate" between composting windrows, which is a violation of Title 14 of the California Code of Regulations section 17863.4.

79.     Defendants' supervisors and managers routinely instructed Plaintiffs Luciano Morales and Joise Mendez Avendano (and other Plaintiffs and employees) to use the toxic leachate water to water the compost and extinguish compost fires. As result, Plaintiffs and other employees were often drenched in the toxic leachate water and/or had to inhale the toxic fumes and were thus exposed to the highly toxic chemicals it contained.

80.     Therefore, as result of their deliberate refusal to comply with government environmental rules and regulations and improperly using untreated toxic leachate during the manufacturing and handling of compostable materials, Defendants deliberately exposed employees, including Plaintiffs, as well as the general public to highly toxic leachate.

81.     In response to Defendants' illegal use of toxic leachate water for industrial purposes, Plaintiffs complained to Defendants' supervisors and managers about the unsafe work conditions caused by Defendants' use of the toxic water and the harm it was causing them and the environment. However, Defendants' managers and supervisors disregarded Plaintiffs' complaints and continued to use toxic leachate to water the compost and put out compost fires.

82.     After Plaintiffs and other employees complained to Defendants' supervisors and managers about Defendants' unsafe, illegal, and unethical business practices, Plaintiffs'

**COMPLAINT FOR DAMAGES**

relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe and dangerous business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DEFENDANTS SELL GRAPESEED OIL CONTAMINATED WITH TOXIC LEACHATE THAT IS THEN USED IN COSMETICS SOLD TO THE PUBLIC

83.    In addition to selling compost for agricultural and gardening use to the public, Defendants also used the grape pomace compost they deliberately contaminated with toxic leachate, and then falsely sold as "certified organic," to manufacture grapeseed oil. Defendants then sold this contaminated grapeseed oil falsely claiming it to be "organic" to various companies that used it to manufacture cosmetics from the contaminated oil that they then also sold to the public as a natural, "organic" product to be used on customers' bodies and faces.

84.    In addition, Defendants also manufactured culinary grapeseed oil sold for cooking and human consumption from the grape pomace they had deliberately contaminated with toxic leachate. Defendants then sold this contaminated grapeseed oil to the general public falsely claiming it to be "organic" when they were fully aware that customers who purchased the oil would use it for cooking and on their food and thus ingest the contaminated oil.

85.    As result of Defendants' false representations that their compost and resulting grapeseed oil was "certified organic," Defendants also defrauded the companies that purchased the contaminated oil because the companies relied on Defendants' false representations to incorrectly advertise their cosmetics also as "organic" to the public. Therefore, as result of Defendants' deliberate refusal to comply with government environmental rules and regulations and improperly using untreated toxic leachate during the manufacturing and handling of compostable materials, Defendants knowingly exposed the public to toxic cosmetics. Moreover, Defendants' illicit practices also led to defrauding of companies that relied on Defendants' representations that their product was "certified organic" when purchasing the compost, as well as when advertising their own products as "organic" to the public.

**COMPLAINT FOR DAMAGES**

86. Again, as result of Defendants' deliberate refusal to comply with government environmental rules and regulations and improperly using grapeseed oil that was infused with untreated toxic leachate during the manufacturing and handling of grape pomace, Defendants deliberately exposed employees, including Plaintiffs, as well as the public to toxic leachate.

87. For example, Defendants' supervisors and managers routinely instructed Plaintiffs Francisco Bautista and Romualdo Guzman (and other Plaintiffs and employees) to work directly in the vineyard with the grapes and the compost made up of the grape pomace, compost, and grapes, all of which had been "watered" with toxic leachate water and thus contaminated. As result, Plaintiffs and other employees were often drenched in the toxic leachate water and were thus exposed to the highly toxic chemicals it contained.

88. In response to Defendants' illicit business practice of selling products made grape pomace that they had deliberately contaminated with toxic leachate water, Plaintiffs complained to Defendants' supervisors and managers about the unsafe work conditions caused by Defendants' illegal use of the toxic water and the harm it was causing them and the environment. However, Defendants' managers and supervisors disregarded Plaintiffs' complaints and continued to use toxic leachate to water the compost and put out compost fires.

89. After Plaintiffs and other employees complained to Defendants' supervisors and managers about Defendants' unsafe, illegal, and unethical business practices, Plaintiffs relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe and dangerous business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DEFENDANTS ILLEGALLY DISPOSE OF TOXIC LEACHATE BY USING IT FOR NORMAL BUSINESS OPERATIONS INSTEAD OF WATER

90. In addition to illegally dumping toxic leachate through the uses described above, throughout Plaintiffs' employment, Defendants also illegally disposed of toxic leachate by using it during normal business operations. For example, for decades instead of properly trucking out

**COMPLAINT FOR DAMAGES**

the toxic leachate for treatment and safe disposal, Defendants instructed their employees, including Plaintiffs, to use it for "dust control" instead of water by using leachate to spray the dirt roads leading into and inside the Whitehall Lane and Clover Flat Facilities so that the fleets of trucks and other heavy machinery that regularly drove in and out the facilities would not kick up dust into the air and into the surrounding community.

91.    However, the result of Defendants' practice of regularly spraying toxic leachate for dust control was to contaminate the dirt roads and the surrounding community with toxic chemicals and heavy metals. For example, Defendants' supervisors and managers routinely instructed Plaintiffs Luciano Morales and Gary Hernandez (and other employees and Plaintiffs) to fill up Defendants' water tanker trucks with toxic leachate and spray the dirt roads in and around their facilities with the dirty toxic water. Ironically, by repeatedly using toxic leachate for dust control, Defendants contaminated the ground so that dust that was subsequently raised by their trucks and other vehicles driving over it exposed the public and their employees, including Plaintiffs, to toxic dust that they would then have to breathe in. As result of using the leachate for dust control, Plaintiffs and other employees were often drenched in the toxic leachate water and were thus again exposed to the highly toxic chemicals it contained.

92.    Defendants also exposed employees to toxic leachate by forcing employees, including Plaintiffs, to use toxic untreated leachate to "wash" Defendants' trash trucks, service trucks, and other heavy machinery instead of water. As result, Defendants' employees, including Plaintiffs, would get regularly splashed with the toxic leachate.

93.    In response to Defendants' illegal use of toxic leachate water, Plaintiffs complained to Defendants' supervisors and managers about the unsafe work conditions caused by Defendants' illegal disposal of the toxic wastewater and the harm it was causing them and the environment. However, Defendants' managers and supervisors disregarded Plaintiffs' complaints and continued to use the toxic leachate instead of water for dust control and other industrial uses.

94.    After Plaintiffs and other employees complained to Defendants' supervisors and managers about Defendants' unsafe, illegal, and unethical business practices, Plaintiffs relationship with Defendants became even more strained. Defendants began to engage in a

**COMPLAINT FOR DAMAGES**

prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe and dangerous business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DEFENDANTS ILLEGALLY DISPOSE OF TOXIC WASTEWATER BY DUMPING IT ON NAPA'S BACKROADS

95.     Throughout Plaintiffs' employment, Defendants also illegally disposed of toxic leachate by dumping it along the rural, often remote, highways in Napa Valley, thus contaminating the local environment and land from which Napa's wineries made their highly regarded wines. For decades, instead of properly trucking out the toxic leachate for treatment and safe disposal, Defendants instructed their employees, including Plaintiffs, to take trucks containing the leachate and other untreated wastewater and dump the wastewater along the backroads of Napa Valley to reduce the amount of leachate and wastewater that they would have to store at their waste processing facilities, and so as not to have to pay for the leachate to be treated and safely disposed of. Defendants' practice of illegally dumping toxic waste on private and public property is a violation of government laws and regulations, including California Penal Code sections 374.3, 374.4, 374.7 and Napa County Health and Safety Code section 8.52.150.

96.     For example, Defendants' supervisors and managers routinely ordered Plaintiffs Juan Manuel Carillo and Gary Hernandez (and other Plaintiffs and employees) to fill up Defendants' water tanker trucks with toxic leachate water and illegally dispose of it by dumping in remote, secluded locations along the backroads of Napa County where Defendants' illicit business practices would not be observed by government authorities or the public.

97.     In addition to dumping leachate and untreated wastewater on Napa's roads, Defendants also engaged in the illegal and unsafe business practice of dumping rotting food wastewater in the backroads of Napa County. For example, Defendants routinely ordered their garbage truck drivers, including Plaintiffs Ricky Hernandez and Gary Hernandez (and other Plaintiffs and employees), to open the trash trucks' sewage-doors and dump the rotting food wastewater in isolated parts of the Napa Valley community where they would not be seen, like

Napa's backroads. Defendants' disgusting and unsafe business practice of dumping the wastewater along the backroads led to contamination of the environment surrounding the roads around Napa County, including the Napa River and many wineries. Defendants' illicit practices also exposed employees, including Plaintiffs, to dangerous biohazardous waste and chemicals.

98. Again, as result of their deliberate refusal to comply with government environmental rules and regulations and improperly disposing of untreated toxic, food waste, and/or other wastewater, Defendants deliberately exposed employees, including Plaintiffs Ricky Hernandez, Juan Manuel Carillo, Gary Hernandez (and other employees and Plaintiffs), as well as the general public to highly toxic wastewater.

99. In response to Defendants' illegal disposal of toxic leachate and other wastewater, Plaintiffs complained to Defendants' supervisors and managers about the unsafe work conditions caused by Defendants' illegal disposal of the toxic wastewater and the harm it was causing them and the environment. However, Defendants' managers and supervisors disregarded Plaintiffs' complaints and continued to illegally dispose of the toxic leachate into the environment.

100. After Plaintiffs Ricky Hernandez, Gary Hernandez, Juan Manuel Carrillo (and other Plaintiffs and employees) complained to Defendants' supervisors and managers about Defendants' unsafe, illegal, and unethical business practices, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and other employees) for having complained about Defendants' unsafe and dangerous business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

### DEFENDANTS ILLEGALLY DUMP TOXIC BIOMEDICAL, INDUSTRIAL, AND RADIOACTIVE WASTE

101. Throughout Plaintiffs' employment, Defendants engaged in a pattern and practice of illegally taking in hazardous, toxic waste, to illegally increase revenue, despite that their Clover Flat and Whitehall Lane Facilities were only permitted by government agencies to process *non-hazardous* waste. For decades, Defendants illegally accepted Hazardous Waste, as

**COMPLAINT FOR DAMAGES**

defined by Title 22, of the California Code of Regulations, section 66261.3, including biohazardous waste, discarded commercial chemical products, industrial waste, solvents, etc.

102.    For example, for decades Defendants improperly and deliberately collected biomedical waste that contained human blood, used syringes, human excrement, etc. Defendants were callously aware that their employees, including Plaintiffs, would come into contact with the biohazardous waste as part of their duties. Defendants were also aware that chemicals from the biohazardous waste that they were illegally taking in would eventually be improperly released into the environment after it was processed in Defendants' facilities and/or buried in the landfill.

103.    In addition to biohazardous waste, Defendants also illegally took in industrial waste from local factories, plants, and other industrial businesses, such as disposed chemicals and solvents used in their manufacturing and/or industrial processes. Moreover, Defendants also improperly collected radioactive and other toxic military waste and surreptitiously buried it in hidden or distant corners of Defendants' landfill so that government inspectors and/or the public would not find out. Defendants were again aware that toxic chemicals from the industrial and military waste would also be eventually improperly released into the environment after it was buried in the landfill, thus polluting the surrounding areas and exposing employees and the public to highly toxic chemicals from illegally dumped waste.

104.    Defendants also engaged in the illegal practice of disposing of radioactive sludge in the landfill. On or around 2019, Defendants allowed large frac tanks that had been previously used to store radioactive sludge and which still contained radioactive sludge to be stored at Defendants' facilities in violation of government laws and regulations, including the Resource Conservation and Recovery Act, the Toxic Substance Control Act, California's Health & Safety Code, sections 11374.5, 25200, and Title 22 of the California Code of Regulations, sections 66250, et seq. Defendants then ordered employees, including Plaintiffs, to use the contaminated radioactive frac tanks to store the overflowing leachate and toxic wastewater, thereby increasing the wastewater's toxicity by causing it to also become radioactive. Defendants then illegally dumped the toxic, radioactive leachate in Napa's streams, rivers, wineries, roads, etc.

105.    By illegally receiving and collecting hazardous waste and ordering that their

COMPLAINT FOR DAMAGES

employees, including Plaintiffs, process, move around, and/or bury the hazardous waste in the landfill, Defendants exposed their employees, including Plaintiffs, to dangerous substances that increase mortality or increase irreversible illness in violation of applicable government regulations, including the Resource Conservation and Recovery Act, the Toxic Substance Control Act, California's Health & Safety Code, sections 11374.5, 25200, and Title 22 of the California Code of Regulations, sections 66250, et seq.

106.    As part of Defendants' illegal scheme of accepting hazardous and biomedical waste in violation of government regulations and statutes, Defendants also engaged in illegal conduct by falsifying the documentation of the type of trash that entered their facilities for processing and burial—documents intended for government inspectors' review. For example, Defendants ordered Plaintiff Juan Manuel Carillo Sr. (and other Plaintiffs and employees) to falsify the documentation identifying the illegally collected hazardous waste as regular nonhazardous trash to hide that Defendants were violating their facilities' operating permits by illegally taking in hazardous waste. Defendants' deliberate falsification of documents regarding the type of trash their facilities were taking in was also a violation of government laws and regulations, including Title 27 of the California Code of Regulations sections 20510, 21600; Title 14 of the California Code of Regulations section 18815.3; California Health and Safety Code section 25191; and the California Penal Code section 115.

107.    When Plaintiffs, including Plaintiff Juan Manuel Carillo Sr., complained about Defendants illegal practice of falsifying documentation regarding Defendants illegally taking in hazardous waste, Defendants' supervisors and managers became hostile and irate and bluntly told him to "shut-up" and "mind your own business."

108.    As result of their deliberate refusal to comply with government regulations and permits by improperly disposing of hazardous, toxic, and/or radioactive waste, Defendants deliberately exposed employees, including Plaintiffs, as well as the general public and the environment to highly toxic chemicals.

109.    In response to Defendants' illegal collection and processing of hazardous, toxic, and/or radioactive waste, Plaintiffs complained to Defendants' supervisors and managers about

**COMPLAINT FOR DAMAGES**

the unsafe work conditions caused by Defendants' illegal disposal of the hazardous waste and the harm it was causing them and the environment. However, Defendants disregarded Plaintiffs' complaints and continued to illegally collect and dump hazardous waste.

110.    After Plaintiffs complained to Defendants' supervisors and managers about Defendants' unsafe, illegal, and unethical business practice of collecting and dumping hazardous waste, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe and dangerous business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DEFENDANTS IMPROPERLY DISPOSE OF WILDFIRE (DISASTER) DEBRIS

111.    Because wildfire debris often includes toxins such as arsenic, lead, mercury, asbestos, and chlorine, it must be legally disposed of in a safe manner that requires proper documentation certifying its safety before it can be buried in a landfill only certified for non-hazardous waste. Napa County landfills are legally prohibited from accepting structural fire debris and ash without proper permits from the Napa County Planning, Building & Environmental Services ("PBES.") The amount of wildfire (disaster) debris a landfill is permitted to receive must be within the limits of their permit unless the landfill receives an emergency waiver per the process outlined in Title 14 of the California Code of Regulations, sections 17210-17210.9.

112.    Defendants engaged in an illegal pattern and practice of receiving unpermitted wildfire debris in their landfill in their Clover Flat Facility that did not have the proper testing and necessary documentation reflecting that it was *not* hazardous and thus safe and legal to dump at Defendants' facilities. Defendants' actions thus lead to harmful contamination of the landfill and surrounding area and endangering employees, including Plaintiffs.

113.    Defendants also failed to take adequate safety measures to handle the excessive amount of fire debris that they took in, thus endangering employees, including Plaintiffs, as well as the surrounding community. During times when the Governor of California declared a State of

COMPLAINT FOR DAMAGES

Emergency due to massive fires in Napa County as well as surrounding counties, Defendants regularly requested an increase in the amount of wildfire debris that they were permitted to take in. Defendants falsely asserted in their waiver application that the increase in the amount of waste allowed into the landfill posed no "threat to public health and safety or the environment," despite failing taking the necessary safety measures required to process such a large increase of additional debris. As result of Defendants' lack of capacity to safely process and bury the enormous amounts of wildfire debris that they took in, their Clover Flat landfill itself eventually caught fire, endangering their employees, including Plaintiffs, as well as surrounding homes and communities and causing further environmental pollution.

114.    As result of their deliberate refusal to comply with government regulations and permits by improperly taking in uncertified fire debris, Defendants deliberately exposed employees, including Plaintiffs, as well as the general public and the surrounding environment to highly toxic chemicals contained in the fire debris.

115.    In addition, Defendants were also aware that the excessive amount of wildfire debris that it took in would lead to an excessive increase in the amount of toxic leachate that the landfill produced. Defendants were also aware that they were not able to contain and/or store the quantity of toxic leachate produced, and as result the leachate found its way into the Napa River and/or its tributaries, thus contaminating the surrounding area and endangering employees, including Plaintiffs, as well as the community at large.

116.    In response to Defendants' illegal collection and processing of hazardous, uncertified fire debris waste, Plaintiffs complained to Defendants' supervisors and managers about the unsafe work conditions caused by Defendants' illegal disposal of the hazardous waste and the harm it was causing them and the environment. However, Defendants disregarded Plaintiffs' complaints and continued to illegally collect and dump uncertified fire debris waste.

117.    After Plaintiffs complained to Defendants' supervisors and managers about Defendants' unsafe, illegal, and unethical business practice of collecting and dumping hazardous uncertified fire debris waste, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and

COMPLAINT FOR DAMAGES

others) for having complained about Defendants' unsafe and dangerous business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

**DEFENDANTS DELIBERATELY EXPOSE WORKERS TO DANGEROUS BIOHAZARDOUS MEDICAL WASTE**

118.    As result of their longstanding pattern and practice of illegally taking in biohazardous medical waste mixed with other types of waste material, Defendants deliberately endangered their employees' lives and health, including Plaintiffs. Defendants were aware that Plaintiffs' duties, in particular those who worked as Sorters, required Plaintiffs to sort by hand through waste that Defendants collected in order to separate recyclables from other waste to be buried in the landfill. Defendants demanded that employees, including Plaintiffs, hand sort hazardous waste contaminated with used syringes, used medical supplies, materials covered in blood, human feces, and/or other biological waste. This biomedical waste was then mixed with the regular waste, thus contaminating all of the regular waste.

119.    Defendants' pattern and practice of illegally dumping hazardous waste materials at its facilities to improperly increase profits lead to their employees, including Plaintiffs, being routinely exposed to hazardous and harmful waste material. For example, as part of their duties, Plaintiffs Lusiano Morales, Jose Lopez Guzman, Pomilio Jacinto Altamirano Reyes (and other Plaintiffs and employees) came into contact with used syringes and other sharp objects contaminated with blood, feces, or other biological materials as they sorted through the trash to pick out recyclable materials. As result of Defendants' dangerous business practices, many Plaintiffs were stabbed by the syringes and/or received cuts or other injuries, and were thus exposed to potentially dangerous, contagious, incurable, and/or fatal infections and diseases.

120.    Upon recognizing that the waste that Defendants were asking Plaintiffs to sort through was unsafe and potentially dangerous to their health, Plaintiffs regularly complained about Defendants' failure to comply with government regulations and actively advocated for Defendants to adopt and implement appropriate standards and practices. Defendants, however, repeatedly rejected Plaintiffs' requests and/or ignored Plaintiffs' complaints and continued to

collect biohazardous medical waste.

121.    Defendants' dangerous business practice of forcing employees to sort through hazardous biomedical waste was even more egregious due to their deliberate failure to provide Plaintiffs and other employees with adequate protective gear as required by government regulations to improperly cut operating costs and increase profits. As result, Plaintiffs repeatedly complained to Defendants about their refusal to provide them (employees) with protective gear, even when the protective gear was necessary to perform their job duties, such as handling dangerous or toxic chemicals and waste that Defendants illegally took in. Defendants then repeatedly rejected Plaintiffs' complaints and requests to be provided with appropriate and necessary personal protective equipment.

122.    After Plaintiffs complained to Defendants' supervisors and managers about Defendants' unsafe and unethical business practices of forcing Plaintiffs to sort through illegally collected hazardous waste, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe and dangerous business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DEFENDANTS DEFRAUD THE GOVERNMENT AND THE PUBLIC BY FRAUDULENTLY CHARGING FOR SEPARATELY PROCESSING GREEN WASTE

123.    Defendants had a pattern and practice of deliberately and fraudulently misrepresenting the waste disposal services that they provided to government entities and customers, despite being paid to perform those services. Specifically, Defendants were and are required pursuant to their lucrative government contracts to collect different types of garbage (regular trash, recyclables, and green waste) separately to then independently process the different types of waste and thus reduce the amount of trash that ends up in landfills as required by government regulations, including California's Health and Safety Code section 39730; Public Resources Code section 42652; and Title 14 of the California Code of Regulations section 18984.

**COMPLAINT FOR DAMAGES**

124. Moreover, Defendants also charged community members additional fees for providing them with the service of separately picking up and processing their recyclables and green waste from their regular garbage. Pursuant to their contractual requirements with local governments and individual customers, Defendants were supposed to send different garbage trucks to pick up the different types of waste independently so that recyclable and green waste loads did not mix together with the regular trash and improperly end up in the landfill. However, despite their contractual requirements with local governments and customers, Defendants deliberately mixed garbage loads by frequently sending only one truck to pick up more than one and/or all three types of waste to improperly reduce operating costs and increase profits.

125. Pursuant to their fraudulent business practices, Defendants regularly instructed employees driving the trash trucks, including Plaintiffs, to pick up *all* types of trash, when they were supposed to only pick up one type of trash (*e.g.*, recycling, etc.) leading to improperly mixed trash loads that ended up in landfills. Despite being mandated by government rules, as well as contractual obligations to provide recycling services to customers, including the collection, pick-up, and hauling of recyclable materials to reduce the amount of waste that ends up in landfills, Defendants deliberately refused to provide the necessary service while continuing to charge the public for the recycling collection services that it did not provide.

126. On other occasions, Defendants ordered employees, including Plaintiffs, to fraudulently report that they (employees) had picked up trash from business customers whom Defendants typically only charged when they actually picked up trash from that particular customer, even when the businesses did *not* have any trash and thus should not have been charged anything. For example, on several occasions, Defendants ordered Plaintiff Juan Manuel Carrillo Sr. (and other Plaintiffs and employees) to report that they had picked up trash from a customer company even when Plaintiffs repeatedly informed Defendants that there was nothing to pick up. Defendants engaged in this practice knowing that most business customers would not scrutinize their bills closely, and even if they did, the customers would not realize that there had been nothing in their dumpsters, thus allowing Defendants to fraudulently increase their profits by charging for work they never performed.

**COMPLAINT FOR DAMAGES**

127. On many occasions, Plaintiffs complained about Defendants' fraudulent practices, but when they questioned Defendants' business practices, Defendants bluntly told them that they did not want through the effort and expense of sending additional trucks to pick up the different types of waste. Defendants then bluntly admonished Plaintiffs, telling them and other employees that they should not question Defendants' decisions because they "did not know better."

128. After Plaintiffs complained to Defendants' supervisors and managers about Defendants' fraudulent and unethical business practices of charging public entities and individual customers for services that they had not provided, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unethical and fraudulent business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DEFENDANTS DEFRAUD CUSTOMERS BY DELIBERATELY CHARGING THEM IMPROPER HIGHER RATES

129. In addition to improperly charging customers for the separate collection, pick-up, and hauling of recyclable materials that they frequently had not performed, Defendants also engaged in a pattern and practice of improperly and deliberately overcharging certain customers for collection and disposal of their waste. For example, on many occasions Defendants ordered employees, including Plaintiffs, to fraudulently note in customers' records that they should be charged the higher "Distance" rate, instead of the more appropriate, lower "Roadside" rates. Defendants did this knowing that most customers would not scrutinize their bills closely, and even if they did, that they would not know what the "Distance" rate was or that it was inappropriately applied to them, thus allowing Defendants to fraudulently increase their profits.

130. On several occasions, Plaintiff Gary Hernandez (and other Plaintiffs and employees) complained to Defendants' managers and supervisors that Defendants were improperly charging customers higher rates, but they disregarded their complaints. After Plaintiffs complained to Defendants' supervisors and managers about Defendants' unethical and fraudulent business practice of charging individual customers improper higher rates for services,

**COMPLAINT FOR DAMAGES**

Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' illicit business practices. Defendants' retaliatory actions towards the Plaintiffs, included but were not limited to, undeserved discipline, write-ups and warnings, reduction in hours, reassignment to undesirable and substantially physically demanding jobs, refusal to promote them, termination, forcing Plaintiffs to drive vehicles with faulty brakes and bald tires, forcing Plaintiffs to drive vehicles without working defrosters or window wipers, forcing Plaintiffs to work putting out fires without training or safety training equipment, forcing Plaintiffs to work sorting hazardous and medical waste without the proper safety equipment, forcing Plaintiffs to work mandatory overtime, changing the garbage truck drivers routes to add additional stops or making it longer, denying Plaintiffs access to the restroom facilities, and denying Plaintiffs access to drinkable water and cool-down breaks.

131.     In fact, Defendants retaliated against Plaintiff Gary Hernandez for complaining about Defendants deliberately overcharging customers, as well as for complaining about Defendants' other unethical and dangerous business practices, by unnecessarily forcing him to remain at work even after he completed his job tasks and work shift in order to prevent him from picking up his son from school; cutting his rest/lunch breaks short; giving additional trash routes, and/or extending his trash routes so as to increase the amount of work he had to do; and giving him trash routes that required him to drive long distances from Defendants' facilities as punishment for his many complaints about Defendants' illicit business practices.

## DEFENDANTS DELIBERATELY ENDANGER WORKERS BY FORCING THEM TO FIGHT FIRES WITH NO TRAINING OR PROPER EQUIPMENT

132.     In addition to improperly overcharging customers for the disposal of their waste, Defendants also engaged in a pattern and practice of endangering their workers by forcing them to work as volunteer firefighters fighting fires and/or clearing fire debris in and around Defendants' facilities. Government regulations, including Health and Safety Code, section 13159.1, require that volunteer firefighters be trained and certified to work fighting fires. In addition, the Napa County Fire Department requires that volunteer firefighters receive 144 hours

COMPLAINT FOR DAMAGES

of training before certifying them as volunteer firefighters. Despite these regulations to ensure the safety of the person fighting fires as well as those around him, Defendants regularly forced their employees, including Plaintiffs, to work as volunteer firefighters whenever Defendants' facilities were threatened by wildfires and/or threatened by fires within the facilities caused Defendants' unsafe and illicit business practices.

133.    Despite the fact that their duties as Sorters, Drivers, and Laborers in Defendants' waste processing facilities were completely unrelated to fighting fires, Defendants callously used their employees, including Plaintiffs, as a captive labor force that they then exploited for their own benefit by illegally risking their employees' lives to protect Defendants' financial interests and property by sending them into the hills surrounding Defendants' facilities to fight wildfires whenever wildfires threatened Defendants' property. For example, on several occasions Defendants instructed employees, including Plaintiffs Joise Mendez Avendano, Juan Manuel Carrillo Sr., Romualdo Guzman, Juan Carrillo de La Luz, Jose Lopez Guzman, Efrain Inda Verdin, Francisco Bautista (and other Plaintiffs) to try to put out the fires around their Clover Flat and Whitehall Lane Facilities despite being aware that Plaintiffs were not trained or certified to fight fires.

134.    In addition to fighting the fires that affected the community of Napa Valley, Defendants callously used their employees, including Plaintiffs, as firefighters in the numerous onsite fires that ignited due to the poor safety regulations and lack of safeguards. For example, on several occasions Defendants' supervisors and managers instructed employees, including Plaintiffs Juan Manuel Carrillo Sr., Luciano Morales, Francisco Bautista (and other Plaintiffs and employees) to put out the fires around or over the compost or around or over the waste/garbage at the Clover Flat and Whitehall Lane Facilities despite being aware that Plaintiffs were not trained or certified to fight fires.

135.    Defendants' callous disregard for their employees' lives, including Plaintiffs, was even more egregious because in addition to illegally demanding that Plaintiffs work as firefighters, Defendants also failed to provide Plaintiffs with any proper protective equipment necessary for the task, such as fire smoke graded face masks, fire repellent clothing, fire resistant

**COMPLAINT FOR DAMAGES**

gloves, helmets, etc. Instead, Defendants forced Plaintiffs and other employees to use their own bandanas, handkerchiefs, and leftover N-95 masks as their only protection from the heavy smoke caused by the massive fires. As result of Defendants' dangerous business practices, many Plaintiffs and other employees, including Francisco Bautista suffered burns, developed hives, respiratory problems, and/or lingering coughs due to their exposure to the fires and fumes.

136.    Defendants further endangered their employees, including Plaintiffs, by ordering them to clear fire debris from areas within and around Defendants' facilities that had been burned by fires. After the worst of the fires had passed, Defendants forced employees, including Plaintiffs, to walk through smoky, charred, often still smoldering areas to clear out burned trees, poles, man-made structures, etc., using high powered tools that Plaintiffs had never used before and were not trained to use. For example, Defendants ordered Plaintiffs Jose Lopez Guzman, Juan Carrillo De La Luz, Pomilio Jacinto Altamirano Reyes, Pedro Reyes (and other Plaintiffs and employees) to use gas powered chainsaws and tree trimmers without providing them with *any* safety training and/or training on how to use the equipment and/or provided them with protective equipment to safely cut-down trees that ranged from 18 feet to over 30 feet tall.

137.    Defendants' dangerous practice of sending landfill laborers, including Plaintiffs, into burned out areas to clear fire debris was also dangerous because the fires exposed employees, including Plaintiffs, to toxic chemicals created by the fires such as Hexavalent Chromium 6, a toxic airborne chemical that has been identified as a carcinogen. While the metal Chromium can be normally found in soil, when Chromium is heated by fire it can become airborne and change to the highly toxic Hexavalent Chromium 6. This is especially true in the areas surrounding Defendants' Clover Flat and Whitehall Lane Facilities where the soil naturally contained high levels of Chromium, as did the soils in the wildfire waste Defendants took in from other local wildfires such as LNU, Tubbs and Kincaid fires. As result, Defendants exposed their employees, including Plaintiffs, to highly toxic chemicals by ordering them to work putting out fires and/or to clean up recently burned areas without any proper safety equipment.

138.    Defendants' selfish disregard for their employees' lives and safety, including Plaintiffs, in order to protect their own property was also evidenced by Defendants' abusive

**COMPLAINT FOR DAMAGES**

practice of ordering Plaintiffs and other employees to work through their meal and rest breaks so they could continue to work fighting fires and/or clearing our fired debris without rest. Defendants then failed to pay Plaintiffs the meal and rest breaks they forced Plaintiffs to miss.

139.    On several occasions, Plaintiff Luciano Morales (and other Plaintiffs and employees) complained to Defendants' managers and supervisors that Defendants were endangering the employees by ordering them to fight the fires and clear out fire debris when they were not trained or certified to do so; that Defendants had failed to provide Plaintiffs with the proper safety equipment; and that Defendants had failed to provide Plaintiffs with appropriate safety training. However, Defendants completely ignored Plaintiffs' complaints.

140.    After Plaintiffs complained to Defendants' supervisors and managers about Defendants' unsafe business practices of forcing employees to fight the fires and clear out burned-out areas without providing them with safety training or equipment, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' illicit and unsafe business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

**DEFENDANTS DELIBERATELY ENDANGER WORKERS BY FORCING THEM TO WORK THROUGH MASSIVE WILDFIRES VIOLATING EVACUATION ORDERS**

141.    Defendants also engaged in a pattern and practice of endangering their employees' lives by ordering them to continue to work in areas where large wildfires were actively burning, despite government authorities having issued mandatory evacuation orders for the area. Defendants' actions were thus a violation of government regulations, including Government Code section 8665 and Penal Code section 409.5. For example, Defendants endangered Plaintiffs Gary Hernandez and Ricky Hernandez (and other Plaintiffs and employees) by ordering them to continue to service assigned trash collection routes, even when Defendants were aware that those routes took Plaintiffs dangerously close to burning large wildfires and/or were in areas that were subject to mandatory evacuation orders.

**COMPLAINT FOR DAMAGES**

142. When Plaintiffs informed Defendants that they could not continue to drive the assigned routes because government authorities had issued a mandatory evacuation for the area and had closed the roads, Defendants ordered Plaintiffs to disregard any safety signs posted by any local agencies stating that the roads were closed and continue to work. Defendants also ordered Plaintiffs to disregard any instructions from local agencies, such as police or firefighters, telling Plaintiffs to not continue to drive into the fires because it was not safe, which is also a violation of government laws and regulations, including Penal Code section 148.

143. Defendants' cruel disregard for their employees' safety, including Plaintiffs', is evidenced from the fact that even when Plaintiffs fearing for their lives notified Defendants that the fires were surrounding both sides of the road that they were driving on, Defendants nevertheless ordered Plaintiffs to continue to service their trash routes. When Plaintiffs asked for an explanation as to why Defendants were needlessly risking their (Plaintiffs') lives, Defendants' managers and supervisors repeatedly informed Plaintiffs that the routes needed to be serviced because important, wealthy and/or celebrity customers lived along those routes, including a well-known politician, a sports team executive, and a celebrity winemaker, amongst others.

144. On several occasions, Plaintiffs Gary Hernandez and Ricky Hernandez (and other Plaintiffs and employees) complained to Defendants' managers and supervisors that Defendants were improperly forcing them to service the houses where in active fire areas, and in defiance of the firefighters' and local agencies' orders to evacuate. After Plaintiffs complained to Defendants' supervisors and managers about Defendants' unsafe, illicit, and dangerous business practices, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' illicit business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

**DEFENDANTS DELIBERATELY ENDANGER WORKERS BY FORCING THEM TO DRIVE GROSSLY OVERLOADED TRASH TRUCKS**

145. In addition to endangering the garbage truck drivers by having them drive through

**COMPLAINT FOR DAMAGES**

roads and neighborhoods surrounded by fires, Defendants also endangered drivers, including Plaintiffs, by forcing them to drive grossly overloaded trash trucks. Government regulations, including Title 23, section 127 of the Unites States Code and California's Vehicle Code sections 35550 and 35551, require that vehicles, including garbage trucks, driving on the highway to not carry more weight than the manufacturers' stated safe weight for the vehicle, which is based on the number of axles in the vehicle, the distance between axles, and the vehicle's intended use.

146.    Despite these government regulations, Defendants regularly ordered their garbage truck drivers, including Plaintiffs, to overfill the garbage trucks while collecting garbage from the public to avoid the need for more truck routes or additional trips for the trucks, and thus improperly cut operating costs and increase profits. For example, some of Defendants' garbage trucks were qualified for weights up to 28,000 pounds, but Defendants routinely instructed drivers, including Plaintiffs, to exceed that weight when collecting garbage. Defendants' illegal practice of overloading trucks endangered the garbage truck drivers and other employees because the truck's excessive weight made it very difficult to steer and control the truck due to the imbalance caused by the excessive weight. The danger caused by the drivers' inability to control the truck was exacerbated by the fact that Defendants' drivers had to drive on Napa's mountainous, narrow, and winding roads. Defendants' overloading of their vehicles also increased the chances of catastrophic sudden tire failure and of the vehicle breaking down, thus further endangering employees and other vehicles on the road.

147.    Unsurprisingly, Defendants' dangerous practice of forcing employees to overload trucks led to several accidents. On several occasions, drivers, including Plaintiffs, lost control of the vehicle due to the overloading causing them to veer off the road and almost overturn the truck. Additionally, on several occasions, some of the trucks caught fire in part due to the excessive amount of trash and types of trash Defendants ordered its employees, including Plaintiffs, to pick-up. On one occasion, Plaintiff Juan Manuel Carrillo's overloaded truck caught fire, and he could not put it out until he reached Defendants' facility and was thus forced to drive the truck while on fire. When Plaintiff complained about his truck catching on fire due to Defendants' illegal directives, Defendants callously told him to "be more careful next time or go

**COMPLAINT FOR DAMAGES**

find another job if you do not like the working conditions."

148.    Defendants' dangerous practice of forcing employees to overload trucks was also dangerous because in order to force yet more trash into the trucks, employees had to frequently jump in the middle of the garbage in back of the truck and risk injury from the garbage truck's machinery and/or from dangerous objects in the garbage. For example, per Defendants' orders, Plaintiff Ricky Hernandez and Gary Hernandez (and other Plaintiffs and employees) had to frequently jump into the garbage inside the back of the truck and use a shovel to manually push down the trash to make room for more because the truck was already full and overweight, thus exposing themselves to injury by doing so.

149.    On several occasions, Plaintiffs complained to Defendants' managers and supervisors that Defendants were improperly forcing them to drive overweight trucks. After Plaintiffs complained about Defendants' unsafe business practices, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

**DEFENDANTS DELIBERATELY ENDANGER WORKERS BY FORCING THEM TO USE UNSAFE, POORLY MAINTAINED HEAVY MACHINERY**

150.    In addition to endangering their garbage truck drivers by having them drive overweight trucks, Defendants also engaged in a pattern and practice of endangering employees, including Plaintiffs, by providing them with unsafe heavy machinery to use, including trucks, forklifts, packing machines, bulldozers, compressing machines, etc. Government regulations and codes, including Ttile 8, Section 3328 of the California Code of Regulations, requires that "machinery and equipment in service shall be . . . maintained as recommended by the manufacturer" and the "machinery and equipment in service shall be maintained in a safe operating condition." Despite government requirements, Defendants deliberately failed to service and maintain the machines and heavy equipment used by Plaintiffs and other employees to improperly decrease operating costs and increase profits.

**COMPLAINT FOR DAMAGES**

151. Throughout Plaintiffs' employment with Defendants, Defendants' heavy machinery and equipment used by their employees suffered from numerous extremely serious mechanical and electrical issues, including but not limited to, brake failures, broken hydraulic systems, oil leaks, broken headlights, broken reverse alarms, broken defrosters, broken windshield wipers, no air conditioning ("A/C"), smoking engines, failing brake lights, missing seatbelts, missing seats, and/or bald tires. Whether individually or collectively, these mechanical issues created unsafe work conditions for Plaintiffs and other employees whose safety in the workplace depended on the reliability of Defendants' machinery and its safety features.

152. For example, Defendants' ongoing failure to properly service and maintain their vehicles, including their garbage trucks led to many of their drivers being endangered by truck fires, trucks tipping over, and trucks breaking down on the road. Specifically, on several occasions, Defendants forced Plaintiffs Gary Hernandez, Ricky Hernandez, Juan Carrillo De La Luz, and Juan Manuel Carrilo Sr. (and other Plaintiffs and employees) to drive poorly serviced and maintained garbage trucks that were exceedingly dangerous to drive. On one occasion, Plaintiff Juan Manuel Carrilo Sr.'s truck caught on fire while he was driving it, endangering his health and his life. Similarly, on other occasions Defendants forced garbage truck drivers to drive poorly serviced and maintained garbage trucks that led to some of their trucks tipping over on the road because of the bald tires not being able to sustain the weight of the truck. Moreover, Defendants also forced Plaintiff Gary Hernandez to drive poorly serviced and maintained garbage trucks that led to his truck breaking down on the road because of the bald tires, poor engines, and/or failure to maintain the suspension system.

153. Defendants' ongoing failure to properly service and maintain their vehicles, including their garbage trucks, led to many of their drivers including Plaintiffs having to frequently drive in inclement weather conditions in trucks that did not have the working equipment necessary to drive in those conditions. Specifically, on several occasions, Defendants forced drivers, including Plaintiffs Gary Hernandez and Ricky Hernandez, to drive in rainy and/or foggy conditions common in winter in Napa in trucks without working defrosters or wiper blades. As result, Defendants' employees, including Plaintiffs, were forced to drive large trucks

COMPLAINT FOR DAMAGES

on Napa's often narrow, mountainous roads only having extremely limited visibility, thus requiring drivers to further endanger themselves by driving with their heads sticking out of the windows of their vehicles to see. Defendants' failures to maintain their equipment thus endangered not only Plaintiffs, but also all other persons and vehicles on the road.

154.    Defendants' failure to properly service and maintain their vehicles also forced drivers, including Plaintiffs, to drive large trucks without working backup alarms as required by government regulations. Title 8, section 1592 of the California Code of Regulations requires that vehicle able to haul 2.5 cubic yards of materials must be equipped with a warning device that automatically emits an alarm whenever the vehicle backs up. Despite government regulations, Defendants failed to maintain working backup alarms on Defendants' large vehicles, such as their garbage trucks. As result, Defendants forced employees to drive without working backup alarms, thus endangering their employees, including Plaintiffs, as well as members of the public that happened to be walking near the vehicle when it was in use.

155.    Defendants' failure to properly service and maintain their heavy machinery and equipment also led to their machinery, such as their packing machines, to regularly leak substantial amounts of oil, creating a fire hazard, environmental pollution, and exposing Plaintiffs and other employees to toxic fumes from the burning oil. Instead of appropriate serving the faulty machinery as required by government regulations, Defendants' managers and supervisors simply ordered employees, including Plaintiffs, to come up with improvised, temporary fixes that also placed employees' safety at risk, such asking Plaintiffs, who were not trained to make such repairs, to crawl under leaking heavy machinery and risk getting burned with hot oil to place jury-rigged patches on the leaks and place canisters under the machines in an attempt to prevent the oil leaks from spreading.

156.    Additionally, Defendants' trucks and heavy-duty machines were typically so improperly maintained that they regularly refused to start. Instead of properly fixing the machines, Defendants simply ordered Plaintiffs, including Plaintiffs Romualdo Guzman and Efrain Inda Verdin, to use large amounts of starter fluid to start the engines of trucks and machines that refused to start due to poor maintenance. Starter fluid is highly flammable and

**COMPLAINT FOR DAMAGES**

could easily catch on fire, severely harming Defendants' employees including Plaintiffs. By ordering employees to continuously use excessive amounts of starter fluid to start faulty equipment instead of fixing it, Defendants endangered employees' safety, including Plaintiffs.

157.    On several occasions, Plaintiffs, including Luciano Morales, Pomilio Jacinto Altamirano Reyes, Ricky Hernandez, and Gary Hernandez (and other Plaintiffs and employees) complained to Defendants' managers and supervisors that Defendants were improperly maintaining the machines and equipment thus endangering them and other employees. However, Defendants ignored their complaints and/or met them with hostility. For example, on one occasion when Plaintiff Ricky Hernandez complained about being forced to drive a large garbage truck with completely bald tires and requested new tires for the truck, Defendants responded to his request by callously telling him: "when the tires pop, *then* you get new tires!"

158.    After Plaintiffs complained to Defendants about their illicit and dangerous business practices, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described herein.

## DEFENDANTS DELIBERATELY FALSIFY VEHICLE SAFETY DOCUMENTATION INTENDED FOR GOVERNMENT INSPECTORS OR LAW ENFORCEMENT

159.    In addition to Defendants endangering their employees, including Plaintiffs, by failing to service and maintain their machinery, vehicles, and equipment, Defendants also engaged in a pattern and practice of falsifying documentation intended for government inspectors and/or law enforcement so as the hide the deplorable, unsafe condition of Defendants' vehicles and heavy machinery. For example, Defendants regularly ordered Plaintiffs and other employees to falsify the pre-trip inspection reports commercial drivers have to prepare before every work trip and were required to present to law enforcement or other government inspectors upon demand. Defendants specifically ordered employees, including Plaintiffs, to omit serious and dangerous mechanical problems from their vehicle inspection reports that Defendants were aware of, such as faulty brakes, bald tires, broken headlights, faulty steering, missing seatbelts,

**COMPLAINT FOR DAMAGES**

broken windshield wipers and defoggers, etc. Defendants' deliberate falsification of vehicle inspection reports was a violation of government laws and regulations, including Title 13, section 215 of the California Code of Regulations; Title 49, sections 395.8, 396.11, and 396.13 of the Code of Federal Regulations; as well as California Penal Code section 115.

160.    On several occasions, Plaintiffs Gary Hernandez and Ricky Hernandez (and other Plaintiffs and employees) complained to Defendants' managers and supervisors that Defendants were forcing them to draft false pre-trip inspection reports, and that the vehicles that they were being asked to drive had serious mechanical issues that endangered them and other people and should be documented and that Defendants needed to fix. However, Defendants ignored Plaintiffs' complaints and reiterated their demands to Plaintiffs to draft the false inspections reports bluntly telling Plaintiffs that employees needed to comply with Defendants' fraudulent directives if the wished to continue to work for Defendants.

161.    After Plaintiffs complained to Defendants' supervisors and managers about Defendants' illicit and fraudulent business practices, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and other employees) for having complained about Defendants' illicit and fraudulent business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DEFENDANTS DELIBERATELY FALSIFY MANDATORY EMPLOYEE TRAINING DOCUMENTATION INTENDED FOR GOVERNMENT INSPECTORS

162.    Defendants also engaged in a pattern and practice of creating fraudulent documentation regarding mandatory training that they had failed to provide their employees, including Plaintiffs, and that had to presented to government inspectors upon demand. Defendants engaged in these illegal practices to hide how little regard they had for employee safety and/or employee training from government inspectors, as well as to improperly increase profits and reduce costs by not having employees take time off from their duties to attend legally required employee training. Defendants' deliberate falsification of documents regarding employee training it failed to provide its employees, including Plaintiffs, was a violation of

**COMPLAINT FOR DAMAGES**

government laws and regulations, including Title 27, Sections 20510 and 21600 of the California Code of Regulations, as well as California Penal Code section 115.

163. For example, on various occasions Defendants presented employees, including Plaintiffs Luciano Morales, Gary Hernandez, Ricky Hernandez, Juan Manuel Carrillo Sr., Filadelfo Romero Salazar (and other Plaintiffs and employees), with documents purportedly "acknowledging" that the employees had received safety and/or other employee training that Defendants had never provided them and then ordered the employees to sign the documents. On other occasions, Defendants even ordered Plaintiffs sign documents falsely attesting that they had attended a "safety training meeting" that had purportedly taken place at Defendants' facilities, even though some of the Plaintiffs had been out working out in the field, and thus could not have attended any such meeting and had never received safety or other training.

164. On several occasions, Plaintiffs complained to Defendants' managers and supervisors that Defendants were forcing them to sign documents falsely acknowledging that Defendants had provided them with employee training when they had not. However, Defendants ignored Plaintiffs' complaints and reiterated their demands that Plaintiffs had to sign the documents if they wished to continue to work for Defendants.

165. After Plaintiffs complained to Defendants' supervisors and managers about Defendants' illicit and fraudulent business practices, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' illicit business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DEFENDANTS DELIBERATELY ENDANGER WORKERS BY REFUSING THEM ACCESS TO WATER AND SHADE DURING EXTREME HEAT

166. Defendants also engaged in a pattern and practice of endangering employees' safety, including Plaintiffs, by denying them legally mandated access to water and shade. Government workplace regulations, including Title 8, Section 3395 of the California Code Regulations mandates that employers provide employees that work primarily outdoors

unimpeded access to drinking water, access to shade, and the discretion to take unimpeded cool-down breaks, particularly during periods of high heat. Despite these government regulations, Defendants refused to allow Plaintiffs and other employees who worked primarily outdoors in Defendants' Clover Flat and Whitehall Lane Facilities located in California's Napa Valley where summer temperatures regularly exceed 100 degrees Fahrenheit.

167.    In fact, Defendants' supervisors and managers reprimanded Plaintiffs and other employees for going to get a drink of water and/or for taking a cool-down break under the shade of a truck, bulldozer, or shed nearby even on very hot days. Defendants' supervisors and managers told Plaintiffs and other employees that believed that such breaks were unnecessary and often warning employees that employees who took those breaks were "stealing from the company," or words to that effect. Defendants engaged in these illegal practices because they had no regard for employees' safety and the danger posed by heat illness, as well as to improperly increase profits and reduce costs by not having employees take time off from their duties to drink water, cool down, and/or use the restroom.

168.    On several occasions, Defendants' employees, including Plaintiffs Luciano Morales, Juan Carrillo de la Luz, (and other Plaintiffs and employees) complained to Defendants' managers and supervisors that Defendants were improperly refusing them access to drinkable water and denying them their cool-down breaks. However, Defendants either ignored their complaints or chastised Plaintiffs for asking for such breaks.

169.    After Plaintiffs complained to Defendants' supervisors and managers about Defendants' unsafe and illicit business practices of not giving employees access to water and shade, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

/ / /

/ / /

**COMPLAINT FOR DAMAGES**

## DEFENDANTS ENDANGERED WORKERS BY REFUSING THEM USE OF THE RESTROOM WITHOUT JUSTIFICATION

170.    In addition to failing to provide employees with cool-down breaks and access to drinking water, Defendants also engaged in an illegal pattern and practice of failing to provide employees, including Plaintiffs, with unimpeded access to clean and properly maintained restroom facilities without any justification for their denial. Defendants' failure to allow employees reasonable access to restrooms violated government regulations, including Title 8, Section 3364 of the California Code Regulations.

171.    For example, Defendants maliciously and regularly refused to allow Plaintiffs Gary Hernandez, Ricky Hernandez, Romualdo Guzman, Jose Lopez Guzman, Pomilio Jacinto Altamirano Reyes, Juan Carrillo de la Luz (and other Plaintiffs and employees) access to restroom facilities during work hours, even though Plaintiffs' use of the toilet facilities was reasonable, was not disruptive to Defendants' business operations, and there were many other employees available to cover for Plaintiffs while they used the restroom facilities.

172.    On several occasions, Plaintiffs complained to Defendants' managers and supervisors that Defendants were improperly refusing them access to restrooms, but Defendants simply ignored Plaintiffs' complaints or chastised them for complaining.

173.    After Plaintiffs complained to Defendants' supervisors and managers about Defendants' unsafe and illicit business practices of not giving them access to the restroom, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) for having complained about Defendants' unsafe business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DEFENDANTS RETALIATE AFTER PLAINTIFFS COMPLAIN TO GOVERNMENT AUTHORITIES ABOUT DEFENDANTS' ILLICIT BUSINESS PRACTICES

174.    In addition to their internal complaints, Plaintiffs also made several complaints to various government agencies about Defendants' illicit, unethical, and unsafe business practices.

COMPLAINT FOR DAMAGES

On or about December 3, 2023, a group of 24 employees and former employees, including Plaintiffs Gary Hernandez, Luciano Morales, Ricky Hernandez, Juan Manuel Carrillo De La Luz, Armando Reyes, Efrain Verdin, Eliseo Reyes, Elias Hernandez, Martin Carrillo De La Luz, Javier Moreno, Pedro Reyes, Pedro Aguilar, Pompilio Reyes, Juan Carrillo De La Luz, Pablo Carrillo, Carlos Cardenas, Jose Lopez, Geronimo Lopez, Efren De Anda, and Juan Manuel Carrillo Sanchez, filed a joint complaint with the California Environmental Protection Agency, the U.S. Department of Justice, the California Department of Forestry and Fire Protection, the California Fish & Wildfire Department, the California Civil Rights Department and the California Department of Industrial Relations. Plaintiffs' complaints included among other things, complaints regarding Defendants' health and safety workplace violations, Defendants' for complaining about the hazardous work conditions, Defendants' lack of maintenance to the vehicles and heavy work equipment, Defendants' discrimination towards employees, Defendants' illicit practices of contaminating the environment and the community, Defendants' practice of endangering employees, including Plaintiffs, by forcing them to work putting out fires without proper training or protective equipment.

175. After Plaintiffs complained to government authorities about Defendants' unsafe, illicit, and unethical business practices, Plaintiffs' relationship with Defendants became even more strained. Defendants began to engage in a prolonged campaign of retaliatory acts towards Plaintiffs for having complained about Defendants' unsafe business practices. Defendants' retaliatory actions towards the Plaintiffs are substantial, as described previously herein and throughout the rest of this Complaint.

## DISABILITY DISCRIMINATION & FAILURE TO ACCOMMODATE

176. In addition to Defendants' failure to provide a safe workplace and their engagement in retaliatory treatment of their employees, including Plaintiffs, Defendants also engaged in illegal and pervasive discrimination towards their disabled employees and employees associated with disabled individuals, including Plaintiffs. As result of Defendants' unsafe work conditions, many of Defendants' employees suffered injuries during the performance of their jobs, including but not limited to, Plaintiffs Armando Reyes, Romualdo Guzman, Francisco

**COMPLAINT FOR DAMAGES**

Bautista, Juan Manuel Carrillo Sr., Luciano Morales, and Pedro Reyes. After Plaintiffs promptly informed Defendants of their disabilities and need for accommodation, Defendants failed to schedule good-faith interactive meetings and failed to accommodate Plaintiffs in good faith. Instead, Defendants simply disregarded Plaintiffs' complaints and refused to provide them with reasonable accommodations, despite being aware of Plaintiffs' injuries, and/or medical conditions and resulting disabilities.

177.    Moreover, after employees, including Plaintiffs, reported their medical conditions and resulting disabilities to Defendants, Defendants engaged in a pattern and practice of retaliating against disabled employees, including Plaintiffs, by cutting their work hours, paying them for less hours than they worked, punishing them with more physically demanding work tasks, giving them pretextual warnings and other undeserved discipline, and/or terminating them, among other retaliatory adverse employment actions described herein.

178.    For example, after Plaintiff Juan Manuel Carrillo Sr. suffered a workplace injury to his eye as result of waste material getting in his eye, he promptly reported the injury to Defendants' managers and supervisors. Because Plaintiff Juan Manuel Carrillo Sr.'s eye injury affected his ability to see and work, among other major life activities, he was disabled under California law. Despite Plaintiff Juan Manuel Carrillo Sr. diligently reporting his injuries to Defendants and requesting reasonable accommodation, such as taking time off work to seek medical treatment and recuperate from his injury, Defendants failed to schedule a good-faith interactive meeting and failed to accommodate or discuss accommodating Plaintiff. Instead, without regard for his medical condition, Defendants blatantly refused Plaintiff's request for reasonable accommodation. Defendants then threatened that if Plaintiff took time off work, Defendants would reduce his pay, discipline him, and/or terminate him.

179.    Similarly, on several occasions Plaintiff Francisco Bautista's reported to Defendants' managers and supervisors that his wife suffered from renal failure. Because Plaintiff Francisco Bautista's wife's renal failure affected her ability to eat, breathe, and work, among other major life activities, she was disabled under California law. Despite Plaintiff Francisco Bautista diligently reporting his wife's medical condition to Defendants and requesting

COMPLAINT FOR DAMAGES

reasonable accommodations, such as taking time off work to take his wife to medical appointments and/or otherwise care for his disabled wife, Defendants failed to schedule a good-faith interactive meeting and did not discuss accommodating Plaintiff in good faith with him. Instead, without regard for his wife's medical condition, Defendants blatantly refused Plaintiff's request for accommodations such as taking time off work to assist and/or care for his disabled wife. Defendants then threatened if Plaintiff took any time off to care for his sick wife, Defendants would reduce Plaintiff's pay, discipline him, and/or terminate him.

180.    Additionally, after Plaintiff Luciano Morales suffered a severe back injury, he promptly reported his injury to Defendants' managers and supervisors. Because Plaintiff Luciano Morales' severe back injury affected his ability to stand, walk, and work, among other major life activities, he was disabled under California law. Despite Plaintiff Luciano Morales diligently reporting his medical condition to Defendants and requesting reasonable accommodations, such as taking time off work to seek medical treatment and recuperate from his injury, Defendants never scheduled a good-faith interactive meeting and did not discuss accommodating Plaintiff in good faith with him. Instead, without regard for his medical condition, Defendants blatantly refused Plaintiff's request for reasonable accommodation of taking time off work. Defendants then threatened if Plaintiff took any time off to care for his disability, Defendants would reduce Plaintiff's pay, discipline him, and/or terminate him.

181.    Similarly, after Plaintiff Juan Carrillo de la Luz suffered from a workplace injury to his hand and tendon after he was cut while separating metal at Defendants' facility, he promptly reported his injury to Defendants' managers and supervisors. Because Plaintiff Juan Carrillo de la Luz's hand and tendon injury affected his ability to grab and work, among other major life activities, he was disabled under California law. Despite Plaintiff Juan Carrillo de la Luz diligently reporting his hand injury to Defendants and requesting reasonable accommodations, such as taking time off work to seek medical treatment and recuperate from his injury, Defendants never scheduled a good-faith interactive meeting and did not discuss accommodating Plaintiff in good faith with him. Instead, without regard for his medical condition, Defendants blatantly refused Plaintiff's request for accommodations, such as taking

**COMPLAINT FOR DAMAGES**

time off work for his disability. Defendants then threatened if Plaintiff took any time off to care for his disability, Defendants would reduce Plaintiff's pay, discipline him, and/or terminate him.

182. After Plaintiffs complained about Defendants' failure to provide them with reasonable accommodations and about Defendants' discriminatory, hostile, and retaliatory treatment, Defendants' hostile treatment towards the disabled and injured Plaintiffs increased. Defendants subjected Plaintiffs' work to unfair scrutiny, whereby Defendants' supervisors and managers falsely and in bad faith criticized and denigrated Plaintiffs' work and berated and yelled at Plaintiffs for any reason no matter how trivial and placed Plaintiffs in more physically demanding and less desired work assignments, among other retaliatory actions, as punishment.

183. Seeing that Defendants' failure to provide the injured and disabled Plaintiffs with reasonable accommodations, some of the Defendants' other employees, including the some of the other Plaintiffs tried to assist them with the heavy tasks Defendants had assigned them that were causing them pain. Upon seeing other employees, including Plaintiffs, were helping the injured and disabled Plaintiffs with heavy tasks, Defendants specifically ordered Plaintiffs and other employees not to assist the injured and disabled Plaintiffs with *any* tasks and insisted that the injured Plaintiffs perform all duties by themselves, despite knowing that they were injured, in pain, and that the heavy tasks they assigned to them could be reassigned to other employees without causing Defendants undue hardship.

## DEFENDANTS ENGAGE IN EGREGIOUS RACIAL DISCRIMINATION & HARASSMENT TOWARDS LATINO WORKERS

184. Defendants also had a pattern and practice of knowingly and brazenly providing preferential treatment to non-Latino employees and treating Plaintiffs and other employees with hostility based on their race, nationality, immigration status, and/or ability to speak English, among other characteristics protected by law.

185. Throughout Plaintiffs' employment with Defendants, Defendants' managers and supervisors, including the individual Defendants, repeatedly made derogatory and racist comments to Plaintiffs and other employees intimating that Latinos, immigrants, and/or those of Mexican descent were an inferior and lazy race, including but not limited to, calling them words

**COMPLAINT FOR DAMAGES**

akin to: "bunch of animals," "idiots," and "motherfuckers." Additionally, Defendants' supervisors taunted Plaintiffs and other employees by regularly making hostile and racist remarks directly stating or intimating that Plaintiffs and other employees must be criminals because they were Latinos, of Mexican descent, and/or were immigrants. For example, Defendants regularly referred to Plaintiffs and other Latino and/or Mexican employees as "narcos," "drug addicts," "gang-members," and "gangsters," among other racist names.

186.   Defendants' supervisors also made racist and mocking remarks directly stating or intimating that Plaintiffs and other ethnically Latino employees were of low intelligence because they were Latinos, of Mexican descent, and/or were immigrants. For example, Defendants regularly called Plaintiffs "worthless," "stupid," and "Oaxaquitas," (a Spanish term referring to people from the predominantly indigenous Oaxaca region of Mexico) among other racist remarks. In addition, Defendants' supervisors also made disgusting, patronizing comments implying that Latino employees, including Plaintiffs, had no purpose other than to work because Latino employees tend to engage in criminal behavior when not working, such as: "I don't like to give Mexicans time-off because all they do is go to Mexico and get drunk," and "those people [Latinos] are only here to work the system." Plaintiffs were extremely offended by Defendants' unwelcome, degrading, and racist comments.

187.   Defendants' supervisors, including Defendant Christina Pestoni Abreu, also made hostile and mocking remarks about the fact that Spanish-speaking Plaintiffs (and other employees) would speak Spanish to other Latino employees, even going as far as mocking the employees' accents. Defendants' managers and supervisors frequently instructed Plaintiffs and other employees not to speak Spanish together while working. In fact, Defendants' supervisors, including Defendant Christina Pestoni, bluntly told employees, including Plaintiffs, that the *only* language employees were allowed to speak at work was English. Moreover, Bob Pestoni made it known that he believed that he could control the Latino employees, saying words akin to "I control these (Latino) people and can get them to do whatever I want."

188.   In addition to making demeaning, offensive, racist remarks towards Latino, Mexican, and immigrant employees, including Plaintiffs, Defendants also gave preferential

**COMPLAINT FOR DAMAGES**

treatment to their non-Latino, non-Mexican, and/or non-immigrant employees, such as ethnically Caucasian and white employees. For example, Defendants gave non-Latino employees and/or non-immigrant employees that Defendants perceived to be "more American" favored and/or easier job assignments or tasks, while assigning Latino, Mexican, and/or immigrant employees, more physically demanding, heavier, and/or more tedious and disfavored work tasks or assignments. In addition, Defendants also improperly gave non-Latino, non-immigrant employees preferential work schedules, reserving coveted shifts, additional shifts, and/or more work hours for non-Latino, non-Mexican, and/or non-immigrant employees.

189.    For example, Defendants' supervisors reserved coveted work assignments for white, American-born workers, such as shorter trash collection routes for the white drivers that took less time to complete, and/or trash routes that were in less remote areas or otherwise were not as difficult to access. Defendants also assigned more technical job assignments, such as operating machinery for white, American-born workers while assigning more physically demanding, dirtier, and more dangerous manual labor tasks to Latino and/or immigrant workers, including Plaintiffs, such as digging dirt, shoveling and moving compost, sorting waste, manipulating toxic smelly leachate, etc. Defendants also demanded that Latino employees, including Plaintiffs, do more physically dangerous work tasks, such as improperly forcing them to put out fires and/or to clear fire debris whenever fires threatened Defendants' facilities—a dangerous task that Defendants did not require white employees to do.

190.    In addition to discriminatorily reserving coveted job assignments for white, American-born employees, Defendants also modified the terms and conditions of their work environment to make it easier for white employees compared to Latino and/or immigrant employees, including Plaintiffs. For example, Defendants regularly approved white employees' requests for vacation or time off while Defendants regularly denied similar requests from Latino and/or immigrant employees, including Plaintiffs. Defendants also generally did not require white employees to work forced overtime, particularly around the holidays, while forcing Latino and/or immigrant employees, including Plaintiffs, to regularly work forced overtime. In addition to providing white employees with coveted job assignments, Defendants also gave white workers

**COMPLAINT FOR DAMAGES**

better, less dangerous equipment, such as newer trucks, heavy machinery, and other equipment necessary to carry out their job duties, while giving Latino and/or immigrant employees, including Plaintiffs, the oldest, least reliable, and most dangerous equipment. Similarly, Defendants routinely approved white employees' requests for assistance with their duties or equipment, while regularly denying similar requests from Plaintiffs and other Latino employees.

191.    Even when both whites and Latino and/or immigrant employees performed the same job assignments, Defendants discriminatorily held Latino workers to an unfair higher standard. For example, Defendants permitted white drivers to rest in the breakroom until their shift was over (while still on the clock and being paid) after the drivers had completed their route picking up trash, whereas Defendants required that Latino and/or immigrant drivers, including Plaintiffs, to drive back out after completing their routes to "assist" other drivers complete theirs. In addition, Defendants also regularly refused to allow Latino and/or immigrant drivers, Latino and/or immigrant employees, including Plaintiffs, to stop during their routes to use the bathroom or get water to drink claiming that the stops caused "too many delays" in completing the routes. In contrast, Defendants gave white drivers the discretion to stop whenever they wanted without repercussion.

192.    In stark contrast to their favored treatment for non-Latino, non-immigrant, employees, Defendants' supervisors often blamed perceived deficiencies in employees' job performance on the fact that the employees, including Plaintiffs, were foreigners, immigrants, of Latino and/or Mexican descent. Frequently, Defendants would unfairly blame Latino, Mexican, and/or immigrant employees, including Plaintiffs, for mistakes non-Latino employees had made. Defendants would also unfairly blame Latino, Mexican, and/or immigrant employees for work tasks that had not been completed by other employees—often openly blaming Latino employees' "laziness" as the reason a task had not been completed. In short, Defendants regularly targeted Latino, Mexican, and/or immigrant employees, including Plaintiffs, by cutting their hours, giving them disfavored, dangerous, and more physically demanding work assignments, giving them the worst equipment, holding them to a higher discriminatory standard, giving the employees

**COMPLAINT FOR DAMAGES**

undeserved warnings, write-ups, and other discipline, including termination, and making changes to the work environment to make it extremely hostile for the targeted Latino employees.

193.    Throughout their employment with Defendants, Plaintiffs repeatedly complained about Defendants' discriminatory race-based, ethnic-based, and/or immigration status based preferential treatment and racist comments to Defendants. However, Defendants disregarded, downplayed, and failed to adequately and properly investigate Plaintiffs' and other employees' complaints and failed to take any action to stop the discriminatory practices. Instead, Defendants' managers and supervisors would laugh off the other supervisors' offensive, racist, discriminatory conduct and would even join in insulting the Latino employees.

194.    After Plaintiffs complained, Defendants targeted Plaintiffs for retaliation and intimidation to punish them and other employees who had complained about Defendants' discriminatory business practices, and/or who supported the Latino, Mexican, and/or immigrant victims of Defendants' discrimination and retaliation in order to silence Plaintiffs and other employees into not making further complaints in the future.

## DEFENDANTS ENGAGE IN DISCRIMINATORY AND RETALIATORY IMMIGRATION PRACTICES TO HIDE THEIR MISCONDUCT

195.    Defendants also had a pattern and practice of using immigration-related practices in an unfair, discriminatory, and/or retaliatory manner. Specifically, Defendants used immigration practices to target Latino employees that they perceived to be immigrants for retribution when they perceived those employees to be troublesome, undesirable, and/or unreliable, such as injured and disabled workers, and/or who asked for accommodations, and/or complained about Defendants' unsafe, harassing, discriminatory, and/or illicit and unsafe business practices, including Plaintiffs. Defendants did this because they believed they could intimidate and take advantage of their predominately blue-collar, lower-educated Latino workforce with its long history of fear of immigration-related reprisals by employers and government authorities.

196.    Throughout Plaintiffs' employment with Defendants, Defendants repeatedly threatened to call immigration enforcement, among other illegal immigration-related threats, to

**COMPLAINT FOR DAMAGES**

intimidate and dissuade Plaintiffs and other employees from complaining and/or punish the employees, including Plaintiffs, for complaining about Defendants' illicit and/or discriminatory business practices. For example, on or about May 2024, Defendants' senior management, including Defendant Christina Pestoni angrily called a meeting with employees in order to question employees to determine which of the employees had made complaints to various government agencies about Defendants' illicit, discriminatory, unethical, and unsafe business practices, including misuse of toxic leachate, illegal dumping of hazardous waste into the tributaries, and dumping hazardous waste in the Clover Flat landfill without the proper permit, among other complaints. At the meeting, Defendant Christina Pestoni Abreu specifically threatened employees, including Plaintiffs, with immigration-related reprisals for having complained, bluntly telling employees that those employees who complained would "*not* be getting their papers," and would "get in trouble" with government authorities.

## DEFENDANTS THREATEN EMPLOYEES WITH CRIMINAL CHARGES IF THEY DISCLOSE OR COMPLAIN ABOUT DEFENDANTS' ILLICIT PRACTICES

197.    In addition to their use of immigration-related threats to silence employees, Defendants also had a pattern and practice of using illegal criminal threats against employees, including Plaintiffs, in order to intimidate employees into not disclosing Defendants' illicit, unethical, and dangerous practices. Defendants' criminal threats to their employees to hide their wrongdoing were a violation of government regulations, including California Penal Code sections 518, 519 and 136.1. Throughout Plaintiffs' employment, Defendants regularly made criminal threats whenever they believed or suspected that Plaintiffs were going to disclose information about Defendants' illegal practices to government authorities. For example, as result of Defendants' practice of illegally taking in hazardous waste, fires regularly broke out at Defendants' facilities. When fires broke out, Defendants specifically forbade employees, including Plaintiffs, from calling the fire department to report the fires. Similarly, Defendants also forbade Plaintiffs from calling paramedics whenever employees, including Plaintiffs, received workplace injuries often caused by Defendants' unsafe and dangerous business practices described above.

**COMPLAINT FOR DAMAGES**

198.    In order to dissuade Plaintiffs and other employees from reporting Defendants' unlawful practices to authorities, Defendants repeatedly made threats to them directly stating or intimating that Plaintiffs and other employees could be arrested and/or criminally charged if they reported Defendants' wrongdoing. For example, Defendants told Plaintiffs that if they reported anything that "they will go to jail," "be deported," "get in trouble" with the police, among other threatening comments. In order to underscore their illegal criminal threats to Plaintiffs and other employees, Defendants also told them that Defendants and the St. Helena Police Department and the Napa County Sheriff's Department had "a special relationship," and that the law enforcement agencies would "always protect" Defendants should any employee report any of Defendants' illegal practices. As result of Defendants' threatening comments, Plaintiffs and other employees became extremely fearful and oftentimes refrained from reporting Defendants' wrongdoing as well as workplace emergencies.

## DEFENDANTS ENGAGE IN A LITANY OF RETALIATORY ACTIONS TOWARDS TARGETED DISFAVORED EMPLOYEES

199.    Throughout Plaintiffs' employment, Defendants' managers and supervisors used their management and supervisory positions to retaliate against employees that they deemed troublesome and/or unreliable, such as injured and disabled workers, and/or who asked for accommodations, and/or complained about Defendants' unsafe, harassing, discriminatory, and/or illicit and unsafe business practices, including Plaintiffs. Defendants thus retaliated against targeted employees, including Plaintiffs, by engaging a variety of hostile acts towards them that individually or collectively constitute adverse employment actions.

200.    For example, Defendants retaliated against Plaintiffs by pretextually disciplining Plaintiffs; denying them promotions; reducing their work hours; punishing them by reassigning them to less desirable and more physically demanding jobs; punishing them by forcing them to perform dangerous jobs such as fighting fires and clearing fire debris without appropriate training or protective equipment; deliberately exposing them to toxic, biohazardous, and radioactive waste; ordering them to use toxic leachate to wash vehicles, heavy equipment, and machines; refusing them reasonable access to drinking water, restrooms, and shade; punishing

**COMPLAINT FOR DAMAGES**

them by demanding that they show up to work for scheduled shifts and then sending them home without justification or pay; threatening to terminate them or actually terminating them; and/or threatening them with deportation, jail time, or other negative legal consequences.

201. Defendants also retaliated against Plaintiffs and other targeted employees by endangering their safety and forcing them to use (the most) unsafe vehicles and most poorly maintained heavy equipment in order to punish them for complaining. Defendants engaged in egregious retaliatory conduct because they were aware that employees, including Plaintiffs, were financially vulnerable and depended on their employment with Defendants to support themselves and their families. As result of their numerous retaliatory acts, Defendants created an oppressive and intimidating work environment for employees rife with fear of reprisals.

## DEFENDANTS PUNISH EMPLOYEES WHO ASSOCIATE WITH OTHERS WHO BELONG TO PROTECTED GROUPS OR ENGAGE IN PROTECTED ACTIVITIES

202. Throughout their employment with Defendants, Plaintiffs regularly associated with other employees including other Plaintiffs who made complaints of race and/or disability harassment, and other types of harassment; complaints of race and/or disability discrimination; who had requested accommodations; who complained about the lack of accommodations; and/or made other complaints about Defendants' illicit, unsafe, and/or discriminatory business practices. As result of their association with other employees, including other Plaintiffs, who were discriminated and/or retaliated against, Defendants also subjected the employees who associated with the aggrieved employees to discriminatory and retaliatory adverse employment actions as punishment for that association. For example, because Defendants knew that Plaintiffs associated with other employees who made protected complaints related to Defendants' ongoing harassment, retaliation, and discrimination, and also knew that Plaintiffs had supported their complaints, Defendants also targeted Plaintiffs for retaliation and intimidation in an effort to punish victims for having made complaints against them, and to punish those employees who associated with and supported the victims, and to attempt to silence Plaintiffs and other victims of Defendants' illicit business practices and keep them from coming forward out of fear.

/ / /

COMPLAINT FOR DAMAGES

**DEFENDANTS SUBJECT EMPLOYEES TO UNLAWFUL PEONAGE**

203.    Defendants also engaged in a pattern and practice of forcing employees to provide services to them without paying them a proper wage. Defendants viewed and treated the vulnerable, blue-collar, typically immigrant Latino employees, including Plaintiffs, as their own personal servants or peons. As result, Defendants, engaged in illegal peonage, in violation of government laws and regulations, including Title 42, Section 1994 of the United States Code.

204.    Specifically, throughout Plaintiffs' employment, Defendants used Plaintiffs as a captive subservient labor force without any rights. As described above, Defendants enforced their disgusting oppressive views of Plaintiffs through mixture of intimidation and coercion via vicious threats and retaliatory acts often so egregious as to callously endanger the lives, health, and safety of Plaintiffs and others who were similarly situated. Unsurprisingly, given their dismissive views of Plaintiffs, Defendants treated them as *de facto* indentured servants who had to comply with all of Defendants' directives or face deportation, criminal charges, eviction (*e.g.*, several employees and Plaintiffs lived on Defendants' properties), and/or other serious consequences. In particular, although Plaintiffs were purportedly laborers in Defendants' waste processing facilities, Defendants regularly 'lent' out Plaintiffs to wealthy friends and associates to perform free labor for those associates. For example, Defendants regularly ordered Plaintiffs to work in Pestoni Vineyard harvesting grapes, working in its fields, and bottling wine. Moreover, Defendants regularly ordered Plaintiffs and other employees to clean up and perform gardening in Christina Pestoni's home and their friends' homes, wash the Pestoni's personal cars, etc. In addition, Defendants also repeatedly sent Plaintiffs to work as servants during high-society parties hosted by Defendants' friends and associates. On other occasions, Defendants forced Plaintiffs to perform free construction work for Defendants' friends and associates, such as repairing fences, recementing driveways, etc. Plaintiffs, including Plaintiff Joise Mendez Avendano (as well as other Plaintiffs and employees), believed that they had no alternative but to perform labor to pay off their living expenses and debts owed to Defendants, including the Pestoni Family, and thus capitulated to Defendants' abusive demands.

/ / /

**COMPLAINT FOR DAMAGES**

**WAGE AND HOUR VIOLATIONS**

205.	In addition to all the foregoing, Defendants also had an illegal pattern and practice of not paying employees, including Plaintiffs, their proper wages.

206.	Throughout Plaintiff's employment, Defendants required Plaintiffs to continue working over eight (8) hours in a day and over forty (40) hours a week and failed to pay Plaintiffs for these additional hours. Towards the end of their shifts, Defendants regularly instructed Plaintiffs to finish all work assigned by Defendants and/or to continue to "assist" other employees, even though it was already after the scheduled end of their shift. Defendants thus obligated Plaintiffs to stay beyond their regular shifts and continue working without pay. Defendants warned Plaintiffs and other employees that if they left before completing all their work, even though they were "off the clock," that they would be disciplined and/or terminated.

207.	Similarly, Defendants frequently demanded that Plaintiffs and other employees arrive at work and start working before the scheduled start of their shifts. According to Defendants, Plaintiffs and other employees had to complete administrative, housekeeping, and/or preparatory tasks required to being their work on their (the employees') own time before the start of their shift. As result, Plaintiffs and other employees had to arrive significantly early in order to prepare reports and/other necessary paperwork, perform visual inspections and maintenance on Defendants' vehicles and machinery, locate and prepare tools, among other preparatory tasks.

208.	Defendants were aware at all times that the amount of work they assigned to Plaintiffs and other employees could not be completed during their assigned shifts and was thus a ploy by Defendants to force Plaintiffs and other employees to work "off the clock," and thus presumably not have to pay the employees their correct wages or overtime.

209.	Despite being tasked to work long hours by Defendants, Plaintiffs and other employees were not compensated for the overtime hours they worked. Frequently, Defendants only paid Plaintiffs and other employees for eight (8) hours in a day when they had worked longer than eight (8) hours a day. Other times, Defendants paid employees, including Plaintiffs, less than eight hours in a day when they had worked more.

210.	Moreover, as discussed above, Defendants frequently demanded that Plaintiffs

**COMPLAINT FOR DAMAGES**

and others perform free labor for Defendants' wealthy friends and associates, and did not pay them for their work even though Plaintiffs remained under Defendants' control when they performed work for Defendants' associates.

211.    Despite usually working shifts of over eight hours in a day for Defendants, Defendants did not usually allow Plaintiffs to take meal breaks or rest breaks. Instead, Defendants ordered Plaintiffs to run errands, move supplies, work on vehicles, and/or clean the work area, among other work tasks. Other times, Defendants simply demanded that Plaintiffs keep performing their normal duties and forego their breaks altogether. As result, Plaintiffs often ate their lunches as they worked. On those few occasions when Defendants provided Plaintiffs with meal breaks or rest breaks, Defendants frequently interrupted them and ordered Plaintiffs to work through their meal and/or rest breaks. Defendants did not pay Plaintiffs for the meal and rest breaks that they did not allow Plaintiffs to take.

212.    When Defendants provided Plaintiffs with paystubs, the paystubs were inaccurate because they reflected less hours and/or other wages than Plaintiffs had worked and earned.

213.    On numerous occasions, Plaintiffs and other employees complained to Defendants about their failure to pay them their correct wages, but Defendants took no action to address the complaints and continued to interrupt Plaintiffs' and other employees' breaks without pay and continued to force Plaintiffs and other employees to work "off the clock" without pay.

214.    In addition, after Plaintiffs and other employees complained to Defendants regarding their wages, Defendants treated Plaintiffs with hostility, yelled at them, mocked them, and made derisive remarks towards them. For example, when Plaintiffs complained about their wages, Defendants told Plaintiffs "you don't have to work here" and "you're lucky to have this job," among other hostile remarks.

215.    After Plaintiffs complained about Defendants' illicit business practice of not paying them their correct wages, Plaintiffs' relationship with Defendants became even more strained. Defendants engaged in a prolonged campaign of retaliatory acts towards Plaintiffs (and others) amply described above.

/ / /

**COMPLAINT FOR DAMAGES**

**UNEQUAL PAY VIOLATIONS**

216.    Defendants also engaged in discriminatory pattern and practice of paying non-Latino employees more than Latino employees on the basis of their race and/or ethnicity, including the Latino Plaintiffs, for performing substantially the same work that Plaintiffs performed.

**FIRST CAUSE OF ACTION**

**Independent Violation of Violation of the Civil Rights Act of 1866 & 42 U.S.C. 1983**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

217.    Plaintiff hereby incorporates by reference all paragraphs above, as if fully set herein by reference.

218.    Section 1 of the Civil Rights Act of 1866 which is grounded in the Thirteenth Amendment states as follows:

219.    "That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

220.    Defendants had a pattern and practice of engaging in unlawful employment practices in violation of the Civil Rights Act of 1866, *as amended*, 42 U.S.C. § 1981 by taking adverse employment actions against Plaintiffs, such as terminating them from their positions, demoting them, forcing the Plaintiffs to work in unsafe conditions, and providing Plaintiffs with physically demanding and dirty jobs.

221.    Plaintiffs are informed and believe and based thereon allege that their

**COMPLAINT FOR DAMAGES**

race/nationality was a substantial motivating factor in Defendants' decision to take adverse employment actions against Plaintiffs, in violation of Civil Rights Act of 1866, *as amended*, 42 U.S.C. § 1981.

222. Plaintiffs, and other employees are racial minorities and members of a protected class or associated with and involved in protecting a member of a protected class, Plaintiffs were discriminated and or retaliated against for engaging in protected activities, and they were treated differently than white citizens and similarly situated persons.

223. As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

224. As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

225. In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs have therefore entitled to punitive damages in an amount according to proof at the time of trial.

226. Plaintiffs have also incurred and continues to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

227. Plaintiffs request that this Court order Defendants to refrain from discriminating against its employees on the basis of their race or nationality.

<u>**SECOND CAUSE OF ACTION**</u>

**DISCRIMINATION AND RETALIATION IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT 29 U.S.C. § 2615**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

228. Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

229. The Family and Medical Leave Act at 29 U.S.C. section 2615 makes it an unlawful employment practice for "any employer to interfere with, restrain, or deny the exercise

**COMPLAINT FOR DAMAGES**

of or the attempt to exercise, any [medical leave] right" or because the employee opposed the unlawful employment practice.

230.    At all times relevant herein, Plaintiffs were entitled to take up to 12 weeks of family care and medical leave in any 12 month period, having more than 12 months of service with defendant and more than 1,250 hours of service in the 12 month period preceding the need for family care and medical leave, as required by 26 U.S.C. section 2611.

231.    Plaintiffs required family medical leave, as more fully set forth in the preceding paragraphs of this complaint, for their own and their family's serious health condition. Plaintiffs provided Defendants with the appropriate notice necessary to invoke their FMLA rights and to request FMLA-protected leave.

232.    Defendants discriminated and retaliated against Plaintiffs by taking adverse employment actions against them for taking protected medical leave in violation of Plaintiffs rights protected by FMLA.

233.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

234.    As a proximate result of Defendants' wrongful conduct, and each of them,

235.    Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

236.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

237.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs have therefore entitled to punitive damages in an amount according to proof at the time of trial.

### THIRD CAUSE OF ACTION

### VIOLATION OF LABOR CODE § 1102.5

### (All Plaintiffs Against All Defendants and DOES 1-50)

238.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set

herein by reference.

239.    Labor Code section 1102.5(a) makes it illegal for an employer to make, adopt, or enforce any rule, regulation or policy preventing an employee from disclosing information to a government agency where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

240.    Labor Code § 1102.5(b) makes it illegal for an employer to retaliate against an employee for disclosing information that the employee reasonably believes violates local, state or federal law.

241.    Labor Code § 1102.5(c) makes it illegal for an employer to retaliate against an employee for refusing to participate in an activity that would result in a violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

242.    Defendants engaged in an unlawful pattern and practice by retaliating against Plaintiff and other employees for complaining about and reporting Defendants unlawful and illegal business practices internally and/or to authorities, and/or for refusing to engage in illegal activities.

243.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

244.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

245.    Plaintiffs have also incurred and continues to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

246.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs have therefore entitled to punitive damages in an amount according to proof at the time of trial.

247.    Plaintiffs request that this Court order Defendants to refrain from retaliating

**COMPLAINT FOR DAMAGES**

against its employees on the basis of their complaints of illicit conduct.

**FOURTH CAUSE OF ACTION**

**Violation of Labor Code § 244 - Immigration Related Threats**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

248.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

249.    Labor Code section 244 makes it unlawful to report or threaten to report an employee's, former employee's, or prospective employee's suspected citizenship or immigration status, or the suspected citizenship or immigration status of a family member of the employee, former employee, or prospective employee, to a federal, state, or local agency because the employee, former employee, or prospective employee exercises a right under the provisions of this code, the Government Code, or the Civil Code constitutes an adverse action for purposes of establishing a violation of an employee's, former employee's, or prospective employee's rights.

250.    Defendants violated Labor Code Section 244 by threatening to report Plaintiffs' and other employees' immigration status or citizenship to authorities because Plaintiffs and the other employees exercised their rights under the provisions of the Labor Code, the Government Code, or the Civil Code, etc.

251.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continues to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

252.    As a proximate result of Defendants' wrongful conduct, Plaintiffs have suffered humiliation, emotional distress, including physical injuries and mental pain and anguish, all to their damage in an amount according to proof at the time of trial.

253.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs rights and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

254.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

**COMPLAINT FOR DAMAGES**

255.    Plaintiffs request that this Court grant a public injunction against Defendants to refrain from engaging in unlawful immigration-related retaliatory threats.

**FIFTH CAUSE OF ACTION**

**Retaliation for Reporting Emergency Condition in Violation of Cal. Labor Code § 1139**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

256.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

257.    California Labor Code section 1139(b)(1) makes it an unlawful employment practice, "[i]n the event of an emergency condition, an employer shall not … Take or threaten adverse action against any employee for refusing to report to, or leaving, a workplace or worksite within the affected area because the employee has a reasonable belief that the workplace or worksite is unsafe." Emergency condition is defined as "[c]onditions of disaster or extreme peril to the safety of persons or property at the workplace or worksite caused by natural forces or a criminal act."

258.    As more fully alleged herein, Defendants and each of them had specific knowledge of Plaintiffs' need for emergency medical treatment by and through their specific requests for leave, Plaintiffs obvious physical conditions and based on statements of pain they disclosed to their supervisors. Notwithstanding, Defendants' management failed and refused to allow Plaintiffs to obtain medical treatment which hastened and resulted in inflaming their medical conditions.

259.    By refusing to permit Plaintiffs to leave the worksite to obtain emergency medical treatment when requested, clearly rendered Plaintiffs' workplace unsafe and put their life and health in extreme peril in violation of Cal. Labor Code section 1139(b)(1).

260.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continues to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

261.    As a proximate result of Defendants' wrongful conduct, Plaintiffs have suffered humiliation, emotional distress, including physical injuries and mental pain and anguish, all to

**COMPLAINT FOR DAMAGES**

their damage in an amount according to proof at the time of trial.

262.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs rights and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

263.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

264.    Plaintiffs request that this Court grant a public injunction against Defendants to refrain from engaging in unlawful immigration-related retaliatory threats.

## SIXTH CAUSE OF ACTION

### Denial of And Discrimination Based Upon The Use Of Sick Leave

### (Labor Code §§ 233, 234, And 246.5)

### (Against All Defendants)

265.    Plaintiff incorporates, by reference, all the foregoing paragraphs of this Complaint, as though fully set forth herein.

266.    Labor Code §233 states that "Any employer who provides sick leave for employees shall permit an employee to use in any calendar year the employee's accrued and available sick leave entitlement, in an amount not less than the sick leave that would be accrued during six months at the employee's then current rate of entitlement, for the reasons specified in subdivision (a) of Section 246.5."

267.    Labor Code §246.5(a) states that upon oral or written request by an employee, an employer shall provide paid sick days for the "Diagnosis, care, or treatment of an existing health condition of, or preventive care for, an employee or an employee's family member."

268.    Both Labor Code §233(c) and §246.5(c)(1) state that an employer shall not deny an employee the right to use accrued sick days, discharge, threaten to discharge, demote, suspend, or in any manner discriminate against an employee for using or attempting to use sick leave to attend to an illness, or for opposing any policy or practice or act that is prohibited by this article.

269.    Labor Code §234 states that "An employer absence control policy that counts sick

67

COMPLAINT FOR DAMAGES

leave taken pursuant to Section 233 as an absence that may lead to or result in discipline, discharge, demotion, or suspension is a per se violation of Section 233. An employee working under this policy is entitled to appropriate legal and equitable relief pursuant to Section 233."

270.    This is further emphasized by the fact that Labor Code §246.5(c)(2) creates a "… rebuttable presumption of unlawful retaliation if an employer denies an employee the right to use accrued sick days, discharges, threatens to discharge, demotes, suspends, or in any manner discriminates against an employee within 30 days of … [o]pposition by the employee to a policy, practice, or act that is prohibited by this article."

271.    Labor Code §233(d) states that "Any employee aggrieved by a violation of this section shall be entitled to reinstatement and actual damages or one day's pay, whichever is greater, and to appropriate equitable relief." Labor Code §233(e) then explicitly creates a private right of action for an employee to seek these remedies and permits the Court to Plaintiffs reasonable attorney's fees if Plaintiffs prevails.

272.    Plaintiffs attempted to use accrued sick leave to seek treatment for a medical condition. In response, Defendants ultimately took adverse employment actions against the Plaintiffs.

273.    As a result of Defendants' failure and refusal to comply with Labor Code §§233, 234, and 246.5, Plaintiff is entitled to recover from Defendants actual damages, including emotional distress damages, equitable relief, attorney's fees, and costs.

**SEVENTH CAUSE OF ACTION**

**Race & Nationality Discrimination**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

274.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

275.    The FEHA codified in Government Code section 12900, et seq. makes it unlawful for an employer to discriminate against an employee on the basis of the employee's race, ethnicity, and/or national origin.

276.    Defendants engaged in an unlawful pattern and practice in violation of the FEHA

68

**COMPLAINT FOR DAMAGES**

by taking adverse action against their employees, including Plaintiff, because of their race. As result, Defendants engaged in a discriminatory pattern and practice by ignoring, ratifying, and/or approving of the unlawful discrimination.

277.    Plaintiffs is informed and believes and based thereon alleges that her disability was a substantial motivating factor in Defendants' decision to take adverse employment actions against Plaintiffs, in violation of Government Code § 12940(a).

278.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

279.    As a proximate result of Defendants' wrongful conduct, and each of them,

280.    Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

281.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

282.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

283.    Plaintiffs request that this Court order Defendants to refrain from discriminating against its employees on the basis of their race or nationality.

## EIGHTH CAUSE OF ACTION

### Harassment

### (All Plaintiffs Against All Defendants and DOES 1-50)

284.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

285.    The FEHA, codified in Government Code section 12900, et seq., makes it unlawful for employers and individuals to harass an employee on the basis of a protected category, such as age, gender, disability, sexual orientation, race or national origin, etc.

286.    Defendants had a pattern and practice of harassing Plaintiffs and other employees

**COMPLAINT FOR DAMAGES**

in violation of the FEHA by engaging in offensive conduct towards them, and/or acting in a hostile and abusive manner towards them, based employee's protected characteristic, such as disability, gender, race, sexual orientation, and/or age.

287.    Defendants engaged in unlawful employment practices in violation of the FEHA by ratifying its employees' conduct and/or failing to take immediate and appropriate action against them for their continued harassment of Plaintiffs.

288.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

289.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

290.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

291.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

292.    Plaintiffs request that this Court order Defendants to refrain from harassment against its employees on the basis of their disability, race, and nationality.

## NINTH CAUSE OF ACTION

### Disability Discrimination

### (All Plaintiffs Against All Defendants and DOES 1-50)

293.    Plaintiff hereby incorporates by reference all paragraphs above, as if fully set herein by reference.

294.    The Fair Employment and Housing Act ("FEHA") codified in Government Code section 12900, et seq. makes it unlawful for an employer to discriminate against an employee on the basis of a protected category, such as the employee's disability or perceived disability.

295.    Defendants engaged in an unlawful pattern and practice in violation of FEHA by

COMPLAINT FOR DAMAGES

taking adverse employment action against Plaintiff and other employees because of their disabilities or perceived disabilities.

296.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

297.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

298.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

299.    Plaintiffs have also incurred and continues to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

300.    Plaintiffs request that this Court order Defendants to refrain from discriminating against its employees on the basis of their disability or perceived disability.

### TENTH CAUSE OF ACTION

**Failure to Accommodate**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

301.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

302.    Government Code section 12940(m) provides that it is unlawful for an employer to fail to make reasonable accommodation for the known physical or mental disability of an employee.

303.    Defendants engaged in an unlawful pattern and practice in violation of FEHA by failing to make reasonable accommodation for Plaintiff's and other employees' known disabilities.

304.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other

**COMPLAINT FOR DAMAGES**

employment benefits in an amount according to proof at the time of trial.

305.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

306.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

307.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

308.    Plaintiff requests that this Court grant a public injunction against Defendants to refrain them from illegally failing to provide reasonable accommodations to their employees for the employees' disabilities.

## ELEVENTH CAUSE OF ACTION

### Failure to Engage in the Interactive Process

### (All Plaintiffs Against All Defendants and DOES 1-50)

309.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

310.    Government Code section 12940(n) provides that it is unlawful for an employer to fail to engage in a timely, good-faith interactive process with the employee to determine effective reasonable accommodations for the employee's disability.

311.    Defendants had a pattern and practice of failing to engage in a timely, good-faith, interactive process with Plaintiffs and other employees to determine effective reasonable accommodations for their known disabilities.

312.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

313.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her

damage in an amount according to proof at the time of trial.

314.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

315.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

316.    Plaintiffs request that this Court grant a public injunction against Defendants to refrain them from illegally failing to engage in a timely, good-faith, interactive process with Plaintiffs and other employees to determine effective reasonable accommodations for their known disabilities.

**TWELFTH CAUSE OF ACTION**

**California Family Rights Retaliation**

**(Plaintiff Crockett Against Defendants Crate Modular and Does 1-50)**

317.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

318.    The California Family Rights Act (Government Code § 12945.2) provides that it is unlawful for an employer to retaliate against an employee for requesting or taking family care or medical leave.

319.    Defendants are subject to the provisions of the California Family Rights Act ("CFRA") because they employed fifty (50) or more full time or part time employees. Plaintiffs are entitled to the benefits of CFRA because they worked for Defendants for more than one year and had at least one-thousand two-hundred and fifty (1,250) hours of service in the year preceding their CFRA leave.

320.    Defendants had a pattern and practice of retaliating against Plaintiffs and other employees because they engaged in protected activities, such as taking or requesting family leaves of absence to care for their families or for their own medical conditions.

321.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other

COMPLAINT FOR DAMAGES

employment benefits in an amount according to proof at the time of trial.

322.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

323.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

324.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

325.    Plaintiffs requests that this Court grant a public injunction against Defendants to refrain from retaliating against employees who rightfully request and/or take leave to bond with their newborn children and/or request or take medical leaves.

### THIRTEENTH CAUSE OF ACTION

**Associational Discrimination**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

327.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

328.    The Fair Employment and Housing Act ("FEHA") codified in Government Code §§ 12900, et seq. makes it unlawful for an employer to discriminate against an employee on the basis of the employee's association with a person who is member of a protected class.

329.    Defendants engaged in unlawful pattern and practice in violation of the FEHA by taking adverse action against their employees because of their association with a person or persons who were victims of Defendants' unlawful discriminatory practices.

330.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continues to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

331.    As a proximate result of Defendants' wrongful conduct, Plaintiffs have suffered humiliation, emotional distress, including physical injuries and mental pain and anguish, all to

their damage in an amount according to proof at the time of trial.

332. In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs rights and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

333. Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

334. Plaintiffs request that this Court grant a public injunction against Defendants to refrain from illegally engaging in adverse employment actions against their employees because of their associated with protected individuals.

**FOURTEENTH CAUSE OF ACTION**

**FEHA Retaliation**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

335. Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

336. Government Code section 12940(h) provides that it is unlawful for an employer to retaliate against an employee for engaging in a protected activity, such as complaining about and/or opposing illegal discrimination and harassment in the workplace, and/or requesting an accommodation for a disability or taking medical leave.

337. Defendants had a pattern and practice of engaging in unlawful employment practices in violation of the FEHA by taking adverse employment actions against Plaintiff and other employees, such as failing to promote them, terminating them from their positions, and/or subjecting them to unnecessary disciplinary actions because the employees engaged in a protected activity.

338. As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

339. As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her

75

**COMPLAINT FOR DAMAGES**

damage in an amount according to proof at the time of trial.

340.   In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

341.   Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

342.   Plaintiffs request that this Court order Defendants to refrain from retaliating against its employees on the basis of their disability, perceived disability, nationality, or race.

## FIFTEENTH CAUSE OF ACTION

### Failure to Prevent Discrimination, Harassment, and Retaliation

### (All Plaintiffs Against All Defendants and DOES 1-50)

343.   Plaintiff's hereby incorporates by reference all paragraphs above, as if fully set herein by reference.

344.   The FEHA codified in Government Code section 12900, et seq., makes it unlawful for an employer to fail to prevent discrimination, harassment, and/or retaliation.

345.   Defendants engaged in unlawful employment pattern and practice by failing to take immediate and appropriate action against their employees for their continued discrimination, harassment, and/or retaliation against Plaintiff and other employees despite Defendants' longstanding awareness of the unlawful retaliation, discrimination, and/or harassment..

346.   As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

347.   As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

348.   In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

76

**COMPLAINT FOR DAMAGES**

## SIXTEENTH CAUSE OF ACTION

### Violation of Labor Code § 246.5 et seq.

### (Against Defendants Relish Labs, LLC, and Does 1-50)

349.     Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

350.     Labor Code section 246.5, et seq., makes it unlawful for an employer to retaliate against an employee who uses sick leave, attempts to use accrued sick leave, or opposes a policy or practice that violates California sick leave law.

351.     Defendants had a pattern and practice of engaging in unlawful employment practices in violation of the Labor Code by taking adverse employment actions against Plaintiffs and other employees, such as failing to promote them, terminating them from their positions, and/or subjecting them to unnecessary disciplinary actions because the employees engaged in a protected activity of using sick leave, attempting to take sick leave, and/or for complaining about Defendants' illicit practices regarding California sick leave law.

352.     As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continues to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

353.     As a proximate result of Defendants' wrongful conduct, Plaintiffs have suffered humiliation, emotional distress, including physical injuries and mental pain and anguish, all to their damage in an amount according to proof at the time of trial.

354.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs rights and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

355.     Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

356.     Plaintiffs request that this Court grant a public injunction against Defendants to refrain from illegally engaging in adverse employment actions against their employees because the employees engaged in a protected activity related to using sick leave.

**COMPLAINT FOR DAMAGES**

## SEVENTEENTH CAUSE OF ACTION

### Violation of Lab. Code § 6310

### (All Plaintiffs Against All Defendants and DOES 1-50)

357.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

358.    Labor Code §§ 6310, et seq., makes it unlawful for an employer to terminate or in any manner discriminate against any employee for making a bona fide oral or written complaint to his or her employer of unsafe working conditions and/or work practices in his employment or place of employment.

359.    Labor Code §§ 6310, et seq., further makes it unlawful for an employer to terminate or in any manner discriminate against any employee who is perceived to have made a bona fide oral or written complaint to his or her employer or to responsible governmental agencies of unsafe working conditions and/or work practices in his or employment or place of employment.

360.    Defendants engaged in an unlawful pattern and practice by retaliating and/or discriminating against Plaintiff and other employees for complaining internally and/or to a government agency about Defendants' unlawful practice of maintaining unsafe working conditions and/or practices, including, but not limited to, Defendants' unlawful practice of placing their financial self-interest ahead of patients' health and safety.

361.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

362.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

363.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

**COMPLAINT FOR DAMAGES**

364. Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

## EIGHTEENTH CAUSE OF ACTION

### Violation of Lab. Code § 6311

### (All Plaintiffs Against All Defendants and DOES 1-50)

365. Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

366. Labor Code § 6311 makes it unlawful for an employer to terminate or in any manner discriminate against any employee for refusing to perform work in the performance of which this code, including Section 6400, any occupational safety or health standard or any safety order of the division or standards board will be violated, where the violation would create a real and apparent hazard to the employee or his or her fellow employees.

367. Labor Code § 6400 provides that every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein and to do what is reasonably necessary to protect the life, safety and health of employees.

368. Defendants engaged in an unlawful pattern and practice by retaliating and/or discriminating against Plaintiffs and other employees for refusing to perform their work under unsafe working conditions, as discussed in detail above.

369. As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

370. As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

371. In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

372. Plaintiffs have also incurred and continue to incur attorneys' fees and legal

**COMPLAINT FOR DAMAGES**

expenses in an amount according to proof at the time of trial.

### NINETEENTH CAUSE OF ACTION

**Violation of Lab. Code § 6399.7**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

373.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

374.    California Labor Code § 6399.7 states that "no person shall discharge or in any manner discriminate against, any employee … because of the exercise of any right afforded pursuant to the provisions of this chapter on such employee's behalf or on behalf of others, nor shall any pay, seniority, or other benefits be lost for exercise of any such right."

375.    Defendants engaged in an unlawful pattern and practice by retaliating and/or discriminating against Plaintiffs and other employees for refusing to perform their work under unsafe working conditions, as discussed in detail above.

376.    Plaintiffs, on their own behalf and on behalf of other aggrieved employees, exercised their right to a safe and healthful workplace environment by requesting safe working conditions, requesting Defendants enforce a safe working environment, and refusing to work if Defendants presented a danger to themselves or other employees.

377.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

378.    As a proximate result of Defendants' wrongful conduct, and each of them,

379.    Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

380.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

381.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

**COMPLAINT FOR DAMAGES**

**TWENTIETH CAUSE OF ACTION**

**Violation of Labor Code section 232.5**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

382.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

383.    California Labor Code section 232.5 prohibits employers from retaliating against employees who disclose information about their working conditions.

384.    Defendants engaged in an unlawful pattern and practice by retaliating against Plaintiffs and other employees for complaining about Defendants' unlawful practice of maintaining unsafe working conditions and practices, including, but not limited to, ongoing sexual assaults and/or harassment, unsafe building temperatures, unsafe equipment and unsafe and unsanitary premises.

385.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

386.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to their damage in an amount according to proof at the time of trial.

387.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

388.    Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

**TWENTY-FIRST CAUSE OF ACTION**

**Violation of Labor Code section 98.6**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

389.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

81

**COMPLAINT FOR DAMAGES**

390.     Labor Code § 98.6, et seq., makes it illegal for an employer to retaliate against an employee for instituting any proceeding under or relating to his or her rights that are under the jurisdiction of the Labor Commissioner, made a written or oral complaint that he or she is owed unpaid wages, or because the employee has initiated any action or notice pursuant to Section 2699, or has testified or is about to testify in a proceeding pursuant to that section, or because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her.

391.     Defendants engaged in an unlawful pattern and practice by retaliating against Plaintiffs for complaining about their unlawful practice of not paying employees their correct wages, among other things.

392.     As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

393.     As a proximate result of Defendants' wrongful conduct, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

394.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

395.     Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial.

**TWENTY-SECOND CAUSE OF ACTION**

**Wrongful Termination in Violation of Public Policy**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

396.     Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

397.     It is unlawful for an employer to take adverse employment actions against employees based on grounds that violate California public policy. It is against the public policy

82

**COMPLAINT FOR DAMAGES**

of the State of California for an employer to violate the FEHA and/or the Labor Code.

398.    Defendants had a pattern and practice of taking adverse employment actions against Plaintiff and other employees based on grounds that violate California public policy, such as because the employees were members of a protected class or associated with members of a protected class, such as being disabled or female, etc.; or because the employees engaged in a protected activity by requesting disability accommodations, taking medical leave, complaining about discrimination, harassment, or retaliation in the workplace, complaining about unsafe, illegal, and unethical business practices by the employer.

399.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered and continue to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

400.    As a proximate result of Defendants' wrongful conduct, and each of them, Plaintiffs have suffered humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount according to proof at the time of trial.

401.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages in an amount according to proof at the time of trial.

## TWENTY-THIRD CAUSE OF ACTION

### Failure to Pay Minimum or Contractual Wages for all Hours Worked

### (All Plaintiffs Against All Defendants and DOES 1-50)

402.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

403.    At all relevant times, Plaintiff was an employee of Defendants covered by the Labor Code and applicable Wage Order(s).

404.    Pursuant to the Labor Code and applicable Wage Order(s), Plaintiff were entitled to receive minimum wages for all hours worked. Defendants failed to pay Plaintiff minimum wages for total hours worked in violation of Labor Code and applicable Wage Order(s).

405.    Plaintiff is informed and believes and thereon alleges that at all relevant times

COMPLAINT FOR DAMAGES

within the limitations period applicable to this cause of action, Defendants' payroll policies and procedures failed to compensate employees, including Plaintiff, for all hours worked.

406.    Plaintiff is informed and believes and thereon alleges that at all relevant times within the limitations period applicable to this cause of action Defendants' illegal compensation of wages resulted in Defendants' failure to compensate each employee for all hours worked in violation of Labor Code Sections 1194 and 1197.

407.    As a result of Defendants' unlawful conduct, Plaintiff has suffered damages in an amount, subject to proof, to the extent they were not paid minimum wages for all hours actually worked. Pursuant to Labor Code Sections 1194 and 1194.2, Plaintiff is entitled to recover the full amount of unpaid minimum wages, interest thereon, liquidated damages, reasonable attorneys' fees and costs of suit.

**TWENTY-FOURTH CAUSE OF ACTION**

**Failure to Pay Overtime Wages**

**(All Plaintiff Against All Defendants and DOES 1-50)**

408.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

409.    At all relevant times, Plaintiff was an employee of Defendants covered by the Labor Code and applicable Wage Order(s).

410.    Pursuant to Labor Code sections 510, 1194 and applicable Wage Order(s) Plaintiffs were entitled to receive overtime wages at a rate of 1.5 times their regular rate of pay for any hours worked in excess of eight (8) hours in a day, and/or forty (40) hours in a week, and/or the seventh working day in a week. Plaintiffs were also entitled to receive two (2) times their regular rate of pay for any hours worked in excess of twelve (12) hours in a day.

411.    Plaintiffs are informed and believe and thereon alleges that at all relevant times within the limitations period applicable to this cause of action, Defendants' payroll policies and procedures failed to compensate their employees, including Plaintiffs, for all overtime hours worked and sometimes only compensated them for eight (8) hours day or forty (40) hours a week or less regardless of their actual work hours.

84

**COMPLAINT FOR DAMAGES**

412.    Defendants' illegal payroll practices resulted in Defendants' failure to pay Plaintiffs' overtime wages and to those employees that worked in excess of eight (8) hours a day or forty (40) hours a week for the combined minutes in violation of Labor Code Sections 510, 1194 and applicable Wage Order(s).

413.    As a result of Defendants' unlawful conduct, Plaintiffs suffered damages in an amount, subject to proof, to the extent that he was not paid a proper overtime rate for the overtime worked.

414.    Pursuant to Labor Code Sections 1194 and 1194.2, Plaintiffs are entitled to recover the full amount of unpaid overtime wages, interest thereon, liquidated damages, reasonable attorneys' fees and costs of suit.

## TWENTY- FIFTH CAUSE OF ACTION

### Failure to Pay Meal Breaks

### (All Plaintiffs Against All Defendants and DOES 1-50)

415.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

416.    At all relevant times, Plaintiffs were Defendants' employee covered by the Labor Code and applicable Wage Order(s).

417.    Plaintiffs are informed and believes and thereon alleges that at all relevant times within the limitations period applicable to this cause of action, Defendants regularly denied and/or interrupted Plaintiffs' and other employees' meal/lunch breaks and rest periods.

418.    At all times herein mentioned, Defendants failed to pay their employees, including Plaintiffs, for such meal and rest breaks that they did not receive.

419.    Pursuant to California Labor Code Sections 218, 218.5 and 1194, as well as the applicable Wage Order(s), Plaintiffs are entitled to recover unpaid compensation, plus interest, plus applicable penalties, reasonable attorneys' fees and costs.

/ / /

/ / /

/ / /

**COMPLAINT FOR DAMAGES**

**TWENTY-SIXTH CAUSE OF ACTION**

**Failure to Provide Accurate Wage Statements**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

420.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

421.    At all relevant times, Plaintiff was Defendants' employee covered by the Labor Code and applicable Wage Order(s).

422.    Pursuant to Labor Code Section 226(a), and the applicable Wage Order(s), Plaintiff was entitled to receive, semi-monthly or at the time of each payment of wages, an accurate itemized statement showing:  a) gross wages earned; b) the total hours worked by the employee; c) net wages earned; and d) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee.

423.    Defendants failed to provide Plaintiff accurate wage statements in accordance with Labor Code Section 226(a). Plaintiff is informed and believes and thereon alleges that at all relevant times within the limitations period applicable to this cause of action, Defendants' payroll policies and procedures of not compensating their employees for all hours worked. Instead, Defendants maintained a policy or practice of not paying Plaintiff wages for all hours worked, but only paying wages for the understated number of hours inaccurately reported as worked on wage statements on those occasions when wage statements were even provided.

424.    Defendants' failure to provide Plaintiff with accurate wage statements was knowing and intentional. Defendants had the ability to provide Plaintiff with accurate wage statements, but intentionally provided wage statements that Defendants knew were not accurate and/or failed to provide any wage statements at all.

425.    As a result of Defendants' conduct, Plaintiff suffered injury. The absence of accurate information on their wage statements has prevented earlier challenges to Defendants' unlawful pay practices, required discovery and mathematical computations to determine the amount of wages owed, caused difficulty and expense in attempting to reconstruct time and pay records, and/or led to the submission of inaccurate information about wages and amounts

**COMPLAINT FOR DAMAGES**

deducted from wages to state and federal government agencies.

426.    Pursuant to Labor Code Section 226(e), Plaintiff is entitled to recover fifty (50) dollars for the initial pay period within the applicable limitations period in which a violation of Labor Code Section 226 occurred and one hundred (100) dollars for each violation of Labor Code Section 226 in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000) per employee.

427.    Pursuant to Labor Code Sections 218 and 226(e), Plaintiff is entitled to recover the full amount of penalties due under Labor Code Section 226(e), reasonable attorneys' fees and costs of suit.

### TWENTY- SEVENTH CAUSE OF ACTION

**Failure to Pay Wages at the Time of Separation**

**(All Plaintiffs Against All Defendants and DOES 1-50)**

428.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein.

429.    At all relevant times, Plaintiffs were Defendants' employee covered by Labor Code Section 201 or 202. Pursuant to Labor Code Sections 201 or 202, Plaintiff was entitled upon separation, to timely payment of all wages earned and unpaid prior to separation.

430.    Defendants failed to pay Plaintiffs and other employees all wages earned and unpaid prior to termination in accordance with Labor Code Section 201 or 202.

431.    Defendants regularly forced Plaintiffs and other employees to work more than eight hours in a day and not compensated them for overtime hours worked. Defendants also prevented Plaintiffs and other employees from taking their meal periods and rest breaks permitted by law. Defendants have failed to pay Plaintiffs and other employees these wages since their termination.

432.    Pursuant to Labor Code Section 201 or 202, Plaintiffs are entitled to all wages earned prior to termination that Defendants did not pay them.

433.    Pursuant to Labor Code Section 203, Plaintiffs are entitled to continuation of his wages, from the day their earned and unpaid wages were due upon termination until paid, up to a

**COMPLAINT FOR DAMAGES**

maximum of thirty (30) days.

434.    As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount, subject to proof, to the extent she was not paid for all wages earned prior to termination.

435.    As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount, subject to proof, to the extent she was not paid all continuation wages owed under Labor Code Section 203.

436.    Pursuant to Labor Code Sections 218, 218.5 and 218.6, Plaintiffs are entitled to recover the full amount of unpaid wages, continuation wages under Section 203, interest thereon, reasonable attorneys' fees, and costs of suit.

## TWENTY-EIGHTH CAUSE OF ACTION

### Violation of Labor Code § 1197.5 - Unequal Pay Based on Race

### (Against Defendants Relish Labs, LLC, and Does 1-50)

437.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

438.    Labor Code § 1197.5(a) states that no employer shall pay any individual in the employer's employ at wage rates less than the rates paid to employees of another race or ethnicity in the same establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where the payment is made pursuant to a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any bona fide factor other than race or ethnicity.

439.    Defendants violated Labor Code section 1197.5 by paying Plaintiffs and other similarly situated Latino and African-American employees less than members of other racial groups.

440.    As a result of Defendants' actions, Plaintiffs are entitled to wages, interest, liquidated damages, costs, and attorney's fees pursuant to Labor Code § 1197.5(g).

///

///

COMPLAINT FOR DAMAGES

## TWENTY-NINTH CAUSE OF ACTION

### Violation of Business & Professions § 17200 et seq.

### (All Plaintiffs Against All Defendants and DOES 1-50)

441.    Plaintiff hereby incorporates by reference all paragraphs above, as if fully set herein by reference.

442.    Defendants' unlawful conduct alleged herein constitutes unfair competition within the meaning of Business and Professions Code Section 17200. Due to their unfair and unlawful business practices in violation of the FEHA and Labor Code, Defendants have gained a competitive advantage over other comparable companies doing business in the State of California that comply with their obligations under the law.

443.    As a result of Defendants' unfair competition as alleged herein, Plaintiff suffered injury in fact and lost money or property. Plaintiff was not paid overtime wages or for missed meal periods and rest breaks, and Defendants terminated Plaintiff for her race, for requesting and/or taking sick leave, and/or for complaining about not being paid properly.

444.    Pursuant to Business and Professions Code Section 17203, Plaintiff is entitled to restitution of all wages and other monies rightfully belonging to him that Defendants failed to pay her and wrongfully retained by means of unlawful and unfair business practices.

## THIRTIETH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (All Plaintiffs Against All Defendants and DOES 1-50)

445.    Plaintiffs hereby incorporates by reference all paragraphs above, as if fully set herein by reference.

446.    Defendants' conduct as described above was extreme and outrageous and was done with the intent of causing Plaintiff to suffer emotional distress or with reckless disregard as to whether their conduct would cause him to suffer such distress.

447.    By the aforesaid acts and omissions of defendants, and each of them, Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings and future earning capacity, attorneys' fees, costs of suit and other pecuniary loss not

presently ascertained.

448.    As a further direct and legal result of the acts and conduct of defendants, and each of them, as aforesaid, Plaintiff has been caused to and did suffer and continues to suffer severe emotional and mental distress, anguish, humiliation, embarrassment, fright, shock, pain, discomfort, anxiety, physical pain and suffering. The exact nature and extent of said injuries is presently unknown to Plaintiff. Plaintiff does not know at this time the exact duration or permanence of said injuries but is informed and believes and thereon alleges that some if not all of the injuries are reasonably certain to be permanent in character.

449.    Plaintiff is informed and believes, and thereon alleges, that the defendants, and each of them, by engaging in the aforementioned acts and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

## THIRTY-FIRST CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (All Plaintiffs Against All Defendants and DOES 1-50)

450.    Plaintiffs hereby incorporate by reference all paragraphs above, as if fully set herein by reference.

451.    In the alternative, Defendants' conduct, as alleged above, was done in a careless or negligent manner, without consideration for the effect of such conduct upon Plaintiff's emotional well-being.

452.    By the aforesaid acts and omissions of Defendants, and each of them, Plaintiffs have been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings and future earning capacity, attorneys' fees, costs of suit and other pecuniary loss not presently ascertained.

453.    As a further direct and legal result of the acts and conduct of Defendants, and each of them, as aforesaid, Plaintiffs have been caused to and did suffer and continues to suffer severe emotional and mental distress, anguish, humiliation, embarrassment, fright, shock, pain,

**COMPLAINT FOR DAMAGES**

discomfort, anxiety, physical pain and suffering. The exact nature and extent of said injuries is presently unknown to Plaintiffs. Plaintiffs do not know at this time the exact duration or permanence of said injuries but is informed and believes and thereon alleges that some if not all of the injuries are reasonably certain to be permanent in character.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray judgment as follows:

1.      The entry of judgment in favor of the Plaintiffs on each and every cause of action;

2.      General Damages in an amount of at least $100,000,000.00;

3.      Special Damages, including but not limited to lost wages, in an amount according to proof;

4.      Punitive Damages in an amount of at least four times the amount of the General and Special damages in this action, and according to proof;

5.      Damages for unpaid minimum wages;

6.      Liquidated damages;

7.      Injunctive relief preventing Defendants from engaging in unlawful discrimination, from failing to accommodate disabled employees, and from failing to engage in the interactive process with disabled employees;

8.      Statutory penalties under Labor Code Sections 1102.5, 226(e) and others;

9.      Damages for unpaid wages earned;

10.     Restitution of all unpaid wages and other monies owed and belonging to Plaintiff that Defendants unlawfully withheld and retained for themselves;

11.     Reasonable attorneys' fees;

12.     Costs of suit;

13.     Interest;

14.     Such other relief as the Court deems just and proper.

**COMPLAINT FOR DAMAGES**

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues that are so triable.

Dated: October 28, 2024

Respectfully Submitted,
**MILON PLUAS LLP**

By: _____
ANGEL PLUAS
JOSHUA MILON
CHRISTOPHER J. DeCLUE
JOSE VALDEZ
Attorney for Plaintiffs

92

**COMPLAINT FOR DAMAGES**